IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO. |
| *ex rel.* Dale Todd, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | |
| | § | |
| FIDELITY NATIONAL FINANCIAL, INC., | § | |
| FTNG HOLDINGS, INC., | § | |
| FTNS HOLDINGS, INC., | § | |
| FIDELITY NATIONAL TITLE GROUP, INC., | § | |
| FIDELITY NATIONAL TITLE INSURANCE | § | FILED UNDER SEAL |
| COMPANY, | § | |
| ALAMO TITLE INSURANCE, | § | **DO NOT ENTER ON |
| CHICAGO TITLE AND TRUST COMPANY, | § | PACER** |
| COMMONWEALTH LAND TITLE INSURANCE | § | |
| COMPANY, | § | |
| COMMONWEALTH LAWYERS TITLE | § | |
| AGENCY HOLDING, LLC, | § | |
| LAWYERS TITLE COMPANY, LLC, | § | |
| SECURITY TITLE GUARANTY CO., | § | |
| TICOR TITLE COMPANY, | § | |
| SERVICELINK, INC., | § | RELATOR DALE TODD'S |
| FIRST AMERICAN FINANCIAL | § | ORIGINAL COMPLAINT |
| CORPORATION, | § | |
| FIRST AMERICAN TITLE INSURANCE | § | |
| COMPANY, | § | |
| CENSTAR TITLE INSURANCE COMPANY, | § | |
| ALL REAL ESTATE SOLUTIONS, LLC, | § | |
| ACCURATE TITLE GROUP, LLC, | § | |
| CONTINENTAL REO SERVICES, INC., | § | |
| PERFORMANCE TITLE, INC., | § | |
| SINGLESOURCE PROPERTY SOLUTIONS, | § | |
| LLC, | § | |
| TELSI REAL ESTATE SOLUTIONS, LLC | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

**<u>RELATOR DALE TODD'S ORIGINAL COMPLAINT</u>**

TABLE OF CONTENTS

I.      Introduction ................................................................................................................. 1

II.     Parties ........................................................................................................................... 7

        A.      Introduction to Relator ..................................................................................... 7

        B.      Introduction to Defendants ............................................................................... 8

                i.      Fidelity Defendants ................................................................................ 8

                ii.     First American Defendants ................................................................... 14

                iii.    Other Defendants .................................................................................. 16

III.    Respondeat Superior and Vicarious Liability ........................................................... 17

IV.     Successor Liability ..................................................................................................... 18

V.      Jurisdiction and Venue ............................................................................................... 18

VI.     Background on Freddie Mac and Fannie Mae ........................................................... 19

        A.      The Role of Freddie Mac and Fannie Mae ..................................................... 19

                i.      Public-Private Hybrid .......................................................................... 19

                ii.     Freddie Mac and Fannie Mae under Federal Conservatorship ............ 23

        B.      Contracts between Freddie Mac and Defendants ............................................ 25

VII.    The Home Buying Process .......................................................................................... 27

        A.      Title Insurance or "Owner's Policies" ............................................................ 27

        B.      Closing Fees .................................................................................................... 30

        C.      RESPA ............................................................................................................. 30

VIII.   Defendants' Scheme to Defraud the Government ...................................................... 31

        A.      Relator's Discovery of the Title Search Fraud and Subsequent Retaliation .......... 31

B.    Bad Title Searches on Freddie Mac-Owned Properties..........................................37

C.    Closing Fees Related to Freddie Mac-Owned Properties.....................................40

    i.    State Laws and Closing Rates...................................................40

    ii.    Overcharging.................................................................42

        a.    Real Estate Closing Fees..............................................42

        b.    Loan Closing Fees....................................................43

        c.    Notary Fees ..........................................................44

        d.    Signing Fee and Document Processing and Delivery Fee.............44

    iii.    Examples of Fraudulent Closing Fees ......................................45

D.    Bad Title Searches on Properties Guaranteed by the Government.......................47

IX.    Actionable Conduct ................................................................................52

A.    The False Claims Act..............................................................................51

B.    The Fidelity Defendants and the First American Defendants Submitted False and/or Fraudulent Claims for Payments to Freddie Mac for Sham Title Work and Numerous Types of Improper Closing Fees Upon Resale of Freddie Mac-owned Foreclosed Homes...........................................55

    i.    Title Searches.................................................................55

    ii.    Closing Fees..................................................................57

C.    Defendants Caused Sellers of Government-Guaranteed Properties to Present False and/or Fraudulent Claims to the Government ................................58

D.    Defendants Made, Used, or Caused to Be Made or Used False Records and/or Statements to Receive Payment from the Government for Sham Title Work, Numerous Other Types of Improper Closing Fees, and Mortgage Guarantees...........................................................................61

    i.    Title Searches.................................................................61

a.       Freddie Mac-Owned Properties ......................................................61

b.       Properties Guaranteed by the Government ....................................63

ii.       Closing Fees ................................................................................66

E.       Defendants Failed to Disclose Its Obligation to Repay Freddie Mac and the Government in Violation of the Reverse False Claims Provision ..................69

i.       Title Searches................................................................................69

ii.       Closing Fees ..................................................................................70

a.       RESPA as to the Buyer .................................................................70

b.       RESPA as to Freddie Mac ..........................................................71

F.       Fidelity National Title Insurance Company Retaliated Against Todd in Violation of the FCA ..............................................................................72

X.       Causes of Action ................................................................................72

A.       Count I – False Claims (31 U.S.C. § 3729(a)(1) (former); 31 U.S.C. § 3729(a)(1)(A) (current))..............................................................................72

B.       Count II – False Records or Statements (U.S.C. § 3729(a)(2) (former); 31 U.S.C. § 3729 (a)(1)(B) (current)) ..........................................................73

C.       Count III – Reverse False Claims (31 U.S.C. § 3729 (a)(7) (former); 31 U.S.C. § 3729 (a)(1)(G) (current))..........................................................75

D.       Count IV – Retaliation (31 U.S.C. § 3730(h))......................................75

XI.       Jury Demand ......................................................................................77

The United States of America, by and through *qui tam* relator Dale Todd ("Todd"), brings this action under 31 U.S.C. §§ 3729–3732 (the "False Claims Act") to recover all damages, penalties, and other remedies established by such statutes on behalf of the United States and himself and would show the following:

## I.    INTRODUCTION

1.    This suit concerns schemes by several title companies, including Fidelity National Financial, Inc. and its affiliates ("Fidelity Defendants"), First American Financial Corporation and its affiliates ("First American Defendants"), and others,[1] from at least 2006 to the present, to defraud the Federal Home Loan Mortgage Corporation ("Freddie Mac"), the Federal National Mortgage Association ("Fannie Mae"), the United States Department of Veterans Affairs ("VA"), and the Federal Housing Administration ("FHA") and the United States Government by performing sham title searches for real estate closings on houses whose mortgages are owned by Freddie Mac or guaranteed by Freddie Mac, Fannie Mae, the VA, or the FHA and by charging Freddie Mac closing fees at illegal rates or for services that were never provided.

2.    Fannie Mae and Freddie Mac were organized in 1968 and 1970 as government-sponsored enterprises ("GSEs") in order to stabilize the secondary market for mortgages and promote access to mortgage credit. Before the housing bubble burst in 2008, each had characteristics of both a federal agency and a private corporation. On the one hand, the GSEs were overseen by a sub-agency of the U.S. Department of Housing and Urban Development and were exempt from most state income taxes and many federal regulations affecting private securities. Fannie Mae and Freddie Mac securities enjoyed obligations and benefits similar to

---

[1] All Real Estate Solutions, LLC, Accurate Title Group, LLC, Continental REO Services, Inc., Performance Title, Inc., SingleSource Property Solutions, LLC, and Telsi Real Estate Solutions, LLC.

securities issued by the U.S. Treasury.  Each GSE also had a direct line of credit with the U.S. Treasury.  On the other hand, both earned a profit and were largely controlled by private shareholders.

3.      Before the financial collapse of the housing market, Fannie Mae and Freddie Mac were profitable.  Fannie Mae reported more than $11 billion total in profits in 2005 and 2006, while Freddie Mac earned a combined $4.3 billion in profits.  By the end of 2007, however, Fannie Mae had lost $2 billion, and Freddie Mac had lost over $3 billion.  By the end of 2008, Fannie Mae's debt exceeded its assets by over $15 billion and Freddie Mac's by over $30 billion. Without the Government's intervention, both likely would have gone into default.

4.      Fannie Mae and Freddie Mac were placed under conservatorship in 2008.  Since then, they have been owned and operated by the Federal Housing Finance Authority ("FHFA"), and not by shareholders.  As part of the conservatorship, the FHFA took title to all of Fannie Mae's and Freddie Mac's assets, capital, property, and obligations and assumed the powers of their former shareholders.  Both were delisted from the New York Stock Exchange.  The United States Treasury has purchased over $116 billion in preferred stock from Fannie Mae and $72 billion in preferred stock from Freddie Mae, of which they have repaid only $19.8 billion and $14.6 billion, respectively.  In 2009, the Congressional Budget Office began reporting Fannie Mae's and Freddie Mac's net operating costs as part of its federal spending projections.

5.      As a result of the housing crisis that began in 2006 or 2007, Freddie Mac has been saddled with hundreds of thousands of foreclosed homes whose mortgages it purchased in bundles from thrift institutions and other mortgage lenders as part of its federal mandate to foster the development of the U.S. housing market by contributing liquidity to smaller lenders.  To

manage the crushing number of re-sales of these foreclosed homes, Freddie Mac has contracted since 2006 or 2007 with both the Fidelity Defendants and the First American Defendants to provide on its behalf the title insurance, escrow, and closing services necessary for a legitimate real estate sale.

6.     Title searches come in two types.  A simple grantor-grantee search, referred to as a "toilet bowl" search because it can be performed anywhere, amounts to no more than an Internet search of public courthouse records.  It can only find encumbrances to title that appear in the chain of title on the deed itself.  At best, such searches are sufficient for extremely limited purposes such as the refinancing of a mortgage to the same mortgage holder.  For any type of real estate sale, industry standards require a full title search, because only a full search can reliably reveal any number of potentially catastrophic encumbrances on the title, including liens, mineral rights, property easements, deed restrictions, nearness to an airport, and proximity to a Superfund site.

7.     The Fidelity Defendants and the First American Defendants invoiced Freddie Mac for industry-standard full title searches, as their contracts required them to perform, and charged accordingly, at rates typically between $500 and $1,300.  The title searches they actually performed, however, were at best basic grantor/grantee searches, which are worth less than $200 when appropriate at all.  Often their title commitments failed to capture even the most basic encumbrances recorded on deeds in the grantor-grantee chain of title.  The title search charges were reflected in false settlement statements submitted to Freddie Mac.  As a result of the sham title searches, the buyers acquired property with unknown liens, encumbrances, and easements.  For example, one title commitment for a property in Aurora, Colorado issued by Fidelity

3

National Financial's affiliate, ServiceLink, failed to disclose that the property was in close proximity to a toxic waste site, the Denver Arapahoe Disposal Site. The commitment also failed to include an exception exempting an investment company from liability for past use of the property. Unbeknownst to the buyers, the property had been used as a bombing range during World War II and the Korean War. Not only did Freddie Mac not receive the services for which it contracted, but, as the seller in these transactions, it took on the liability for the buyers' clouds on title. Of course, its governmental purpose to stabilize the secondary mortgage market in order to increase home ownership was thwarted every time an innocent buyer (usually along with an innocent mortgage lender) was duped into buying a home with unknown encumbrances that could add significant cost, limit the buyer's use and enjoyment of the property, or even render the property uninhabitable.

8.     Freddie Mac not only buys mortgages, but guarantees them, as do Fannie Mae, the VA, and the FHA. The Fidelity Defendants and the First American Defendants handle not only Freddie Mac's foreclosure sales, but sales of houses whose mortgages Freddie Mac, Fannie Mae, the VA, and the FHA has guaranteed. Defendants All Real Estate Solutions, LLC, Accurate Title Group, LLC, Continental REO Services, Inc., Performance Title, Inc., SingleSource Property Solutions, LLC, and Telsi Real Estate Solutions, LLC handle these sales as well. The Fidelity Defendants. First American Defendants, and others, unbeknownst to the lenders and to the governmental guarantors, perform the same "toilet bowl" searches for many of these closings, exposing Freddie Mac, Fannie Mae, the VA, and the FHA to significant additional risk, though they are well aware that Freddie Mac, Fannie Mae, the VA, and the FHA would not offer a guarantee on a mortgage without a full title search. For instance, one title

commitment issued by SingleSource for a property in Brighton, Colorado failed to include several reservations by the Union Pacific Railway Company of mineral rights and an oil and gas lease on the property—basic encumbrances that any competent full title search would have uncovered.

9.      The Fidelity Defendants and the First American Defendants also single out Freddie Mac for inflated and illegal closing fees that they do not charge commercial customers. The settlement statements that these defendants submit to Freddie Mac consistently list service charges in amounts higher than those permitted under state law and/or regulations. Many states set maximum rates for real estate closing fees; other states require title insurance companies to file real estate closing fees with the state, establishing a maximum allowed rate. These title companies routinely charge Freddie Mac for real estate closing fees above these maximum rates. For example, the maximum real estate closing fee permitted by the State of Colorado for the metropolitan Denver area was $240 from December 2005 to May 27, 2010, yet Security Title Guaranty Company, another of Fidelity National Financial's affiliates, has consistently billed Freddie Mac $745 for the fee—$505 more than what was permitted under Colorado law.

10.     Further, the Fidelity Defendants and the First American Defendants charge Freddie Mac for closing-related services that have not been provided at all, such as unnecessary notary services. The Fidelity Defendants and the First American Defendants have further charged Freddie Mac for loan closing fees—fees associated with a new loan—in connection with cash-only purchases that involved no new loans. Finally, the Fidelity Defendants and the First American Defendants have misled Freddie Mac by concealing unauthorized document processing and delivery fees within real estate closing fees, which violates the Real Estate

Settlement Procedures Act, Housing and Urban Development regulations, and industry guidelines.

11.     Relator Dale Todd was hired by Defendant Fidelity National Title Insurance Company as Vice President, Sales and Escrow Manager in 2005. When Relator Todd discovered the Fidelity Defendants' scheme to charge Freddie Mac for full price for sham title searches, he reported the fraud to several high-level executives within Fidelity National Title Insurance Company. As a result of his reporting, he was demoted and Fidelity National Title Insurance Company eliminated his salary and slashed his commission percentage.

12.     The consequences to the Government from these various schemes are enormous. In 2010 alone, banks foreclosed on 1.05 million homes. One source estimates that the Government—through Freddie Mac and Fannie Mae—holds approximately one-quarter, or 262,500, of those bank-owned residences. The Fidelity Defendants and the First American Defendants handle at least 90% of the Government's foreclosure resales nationwide. The overcharges for the title insurance fraud on Freddie Mac-held mortgages alone are therefore estimated at $303,581,250 for 2010. All of the schemes have been underway since at least 2006, resulting in hundreds of millions of dollars in damages to the Government.

13.     The consequences to the nation from this far-reaching fraud are perhaps more serious even than these financial losses to the Government. Todd brings this case with trepidation, understanding when the public learns, as they eventually must, that the Fidelity Defendants and the First American Defendants and the other nationally-known defendants to this suit have failed to protect the integrity of this key component of post-foreclosure real estate transactions, and that the title commitments for many thousands of American homes are not

worth the paper on which they are printed, that knowledge will seriously destabilize the real estate market in the United States even further just as it struggles to recover from its near collapse in 2008.  And all because these companies and their founders saw the tsunami of foreclosures of the last several years and the hardship to Americans they represented as an unprecedented opportunity for profit from foreclosure practices that they thought would never be detected amidst the larger financial chaos.

## II.    PARTIES

### A.    Introduction to Relator

14.    Relator Dale Todd is a citizen of the United States and a resident of the State of Colorado.  Todd has worked in the title industry for over twenty-seven years.  Fidelity National Title Insurance Company recruited Todd in May 2005 to open up its Colorado residential division and serve as Vice President, Sales and Escrow Manager.  While in that position, Todd built the Colorado residential division of Fidelity National Title Insurance Company from the ground up.  Todd also analyzed, designed, and implemented insurance rate and escrow fee structuring throughout the Colorado title market.  In addition, Todd reviewed and prepared closed escrow files for internal auditing, which determined periodically whether Fidelity was complying with the Real Estate Settlement Procedures Act and Colorado insurance regulations. It was in examining title work by Fidelity subsidiaries that Todd first discovered the Fidelity Defendants' rampant title insurance fraud, causing him to initiate a larger investigation of national title companies' foreclosure sale title work.  His position and job duties at Fidelity have radically altered since he began challenging Fidelity subsidiaries' title search practices in 2008.

**B.    Introduction to Defendants**

**i.    Fidelity Defendants**

15.    Defendant Fidelity National Financial, Inc. is a Delaware corporation with its principal place of business in Jacksonville, Florida.  Fidelity National Financial, Inc. is a provider of title insurance, specialty insurance, and claims management services.  Fidelity National Financial, Inc. is the parent corporation for FNTG Holdings, Inc.  Fidelity National Financial, Inc. conducts extensive business nationwide, including within the States of California, Colorado, Delaware, Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia.  Fidelity National Financial, Inc. may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

16.    Defendant FNTG Holdings, Inc. is a Delaware corporation with its principal place of business in Jacksonville, Florida.  FNTG Holdings, Inc. is a provider of title insurance, underwriting, escrow, and closing services.  FNTG Holdings, Inc. is a subsidiary of Fidelity National Financial, Inc. and is the parent corporation of FNTS Holdings, Inc. and Fidelity National Title Group, Inc.  FNTG Holdings, Inc. conducts extensive business nationwide, including within the States of California, Colorado, Delaware, Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia.  FNTG Holdings, Inc. may be served through its registered agent, CT Corporation, System, 1200 South Pine Island Road, Plantation, Florida 33324.

8

17.    Defendant FNTS Holdings, Inc. is a Delaware corporation with its principal place
of business in Jacksonville, Florida.  FNTS Holdings, Inc. is a provider of title insurance, escrow
services, and closing services.  FNTS Holdings, Inc. is a subsidiary of FNTG Holdings, Inc. and
is the parent corporation of Commonwealth Lawyers Title Agency Holding, Ticor Title
Company, Security Title Guaranty Co., and ServiceLink, Inc.  FNTS Holdings, Inc. conducts
extensive business nationwide, including within the States of California, Colorado, Delaware,
Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New
Mexico, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of
Virginia, and the District of Columbia.  FNTS Holdings, Inc. may be served through its
registered agent, Judy Shaw, 1402 Langley Place, McLean, Virginia  22101.

18.    Defendant Fidelity National Title Group, Inc. is a Delaware corporation with its
principal place of business in Jacksonville, Florida.  Fidelity National Title Group, Inc. is a
provider of title insurance and escrow services.  Fidelity National Title Group, Inc. is a
subsidiary of FNTG Holdings, Inc. and is the parent corporation of Fidelity National Title
Insurance Company, Alamo Title Insurance, Chicago Title and Trust Company, and Chicago
Title Insurance Company.  Fidelity National Title Group, Inc. conducts extensive business
nationwide, including within the States of California, Colorado, Delaware, Florida, Hawaii,
Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York,
North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the
District of Columbia.  Fidelity National Title Group, Inc. may be served through its registered
agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street,
Wilmington, Delaware 19801.

9

19.    Defendant Fidelity National Title Insurance Company is a California corporation with its principal place of business in Santa Barbara, California.  Fidelity National Title Insurance Company is a provider of title insurance, underwriting, escrow, and closing services. Fidelity National Title Insurance Company is a subsidiary of Fidelity National Title Group, Inc. Fidelity National Title Insurance Company conducts extensive business nationwide, including within the States of California, Colorado, Delaware, Florida, Hawaii, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia.  Fidelity National Title Insurance Company may be served through its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

20.    Defendant Alamo Title Insurance is a Texas corporation with its principal place of business in San Antonio, Texas.  Alamo Title Insurance is a provider of title examinations, title insurance, and closing services.  Alamo Title Insurance is a subsidiary of Fidelity National Title Group, Inc.  Alamo Title Insurance conducts extensive business in New Mexico and Texas. Alamo Title Insurance may be served through its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

21.    Defendant Chicago Title and Trust Company is an Illinois corporation with its principal place of business in Chicago, Illinois.  Chicago Title and Trust Company is a provider of title insurance and closing services.  Chicago Title and Trust Company is a subsidiary of Fidelity National Title Group, Inc.  Chicago Title and Trust Company conducts extensive business nationwide, including within the States of California, Colorado, Florida, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New York, North Carolina, Rhode Island,

Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia. Chicago Title and Trust Company may be served through its registered agent, CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604.

22.    Defendant Chicago Title Insurance Company is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Chicago Title Insurance Company is a provider of title examinations, title insurance, and closing services. Chicago Title Insurance Company is a subsidiary of Fidelity National Title Group, Inc., and is the parent corporation of Commonwealth Land Title Insurance Company. Chicago Title Insurance Company conducts extensive business nationwide, including within the States of California, Colorado, Florida, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia. Chicago Title Insurance Company may be served through its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201

23.    Defendant Commonwealth Land Title Insurance Company is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Commonwealth Land Title Insurance Company is a provider of title insurance, escrow services, and closing services. Commonwealth Land Title Insurance Company is a subsidiary of Chicago Title Insurance Company. Commonwealth Land Title Insurance Company conducts extensive business nationwide, including within the States of California, Colorado, Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia.

Commonwealth Land Title Insurance Company may be served through its registered agent, CT
Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

24.    Defendant Commonwealth Lawyers Title Agency Holding, LLC is a Delaware
corporation with its principal place of business in Jacksonville, Florida.    Commonwealth
Lawyers Title Agency Holding, LLC is a provider of title insurance, escrow services, and closing
services.    Commonwealth Lawyers Title Agency Holding, LLC is a subsidiary of FNTS
Holdings, Inc., and is the parent corporation of Lawyers Title Company, LLC.    Commonwealth
Lawyers Title Agency Holding, LLC conducts extensive business in California, Colorado,
Delaware, Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Jersey, New Mexico, New
York, and Texas.    Commonwealth Lawyers Title Agency Holding, LLC may be served through
its registered agent, CT Corporation System, 1801 West Bay Dr. NW, Suite 206, Olympia,
Washington  98502.

25.    Defendant Lawyers Title Company, LLC is a Delaware corporation with its
principal place of business in Jacksonville, Florida.  Lawyers Title Company, LLC is a provider
of title insurance, escrow services, and closing services.    Lawyers Title Company, LLC is a
subsidiary of Commonwealth Lawyers Title Agency Holding, LLC.    Lawyers Title Company,
LLC conducts extensive business in California, Colorado, Delaware, Florida, Hawaii, Iowa,
Minnesota, Montana, Nevada, and Texas.  Lawyers Title Company, LLC may be served through
its registered agent, CT Corporation System, 251 E. Ohio Street, Suite 1100, Indianapolis,
Indiana 46204.

26.    Defendant Security Title Guaranty Co. is a Colorado corporation with its principal
place of business in Jacksonville, Florida.    Security Title Guaranty Co. is a provider of title

insurance and closing services.  Security Title Guaranty Co. is a subsidiary of FNTS Holdings, Inc.  Security Title Guaranty Co. conducts extensive business in Colorado and Florida.  Security Title Guaranty Co. may be served through its registered agent, The Corporation Company, 1675 Broadway, Suite 1200, Denver, Colorado 80202.

27.     Defendant Ticor Title Company is a Washington corporation with its principal place of business in Santa Barbara, California.  Ticor Title Company is a provider of title insurance, escrow services, and closing services.  Ticor Title Company is a subsidiary of FNTS Holdings, Inc.  Ticor Title Company conducts extensive business in California, Colorado, Nevada, and Texas.  Ticor Title Company may be served through its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201

28.     Defendant ServiceLink, Inc. is a Delaware corporation with its principal place of business in Coraopolis, Pennsylvania.  ServiceLink, Inc. is the national lender platform for Fidelity National Financial, Inc.  ServiceLink, Inc. is the successor to AssetLink and is a subsidiary of FNTS Holdings, Inc.  ServiceLink, Inc. conducts extensive business nationwide, including within the States of California, Colorado, Delaware, Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia.  ServiceLink, Inc. may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

29.     Defendant ServiceLink Title Company is a Pennsylvania corporation with its principal place of business in Pennsylvania.  ServiceLink Title Company is a provider of title services.  ServiceLink Title Company is a subsidiary of ServiceLink, Inc.  ServiceLink Title

13

Company conducts extensive business in California, Colorado, Delaware, Florida, Hawaii, Indiana, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, Texas, the Commonwealths of Massachusetts and Virginia, and the District of Columbia.  ServiceLink Title Company may be served through its registered agent, CT Corporation System, 100 Pine St., #325, Harrisburg, Pennsylvania 17101.

30.    The defendants named in paragraphs 28 and 29 are hereinafter collectively referred to as "ServiceLink."

31.    The defendants named in paragraphs 15 through 29 are hereinafter collectively referred to as the "Fidelity Defendants."

**ii.    First American Defendants**

32.    Defendant First American Financial Corporation is a Delaware corporation with its principal place of business in Santa Ana, California.  First American Financial Corporation is a provider of title, closing, and escrow services.  First American Financial Corporation is the parent corporation for First American Title Insurance Company.  First American Financial Corporation conducts extensive business nationwide, including within the States of California, Colorado, Delaware, Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia.  First American Financial Corporation may be served through its registered agent, Corporation Service Company/CSC-Lawyers Incorporating Service, 2730 Gateway Oaks Dr., Suite 100, Sacramento, California  95833.

33.     Defendant First American Title Insurance Company is a California corporation with its principal place of business in Santa Ana, California.  First American Title Insurance Company is a provider of title, closing, and escrow services.  First American Title Insurance Company is a subsidiary of First American Financial Corporation.  First American Title Insurance Company conducts extensive business nationwide, including within the States of California, Colorado, Delaware, Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia.  First American Title Insurance Company may be served through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

34.     Defendant Censtar Title Insurance Company was a Texas corporation with its principal place of business in Houston, Texas.  Censtar Title Insurance Company was a provider of title services.  Censtar Title Insurance Company merged with First American Title Insurance Company in June 2009.  First American Title Insurance Company is a subsidiary of First American Financial Corporation.  First American Title Insurance Company conducts extensive business nationwide, including within the States of California, Colorado, Delaware, Florida, Hawaii, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, and Texas, the Commonwealth of Virginia, and the District of Columbia.  Censtar Title Insurance Company may be served c/o First American Title Insurance Company's registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

35.     The defendants named in paragraphs 32 through 34 are hereinafter referred to
collectively as the "First American Defendants."

**iii.     Other Defendants**

36.     Defendant All Real Estate Solutions, LLC is an Ohio corporation with its
principal place of business in Ohio.  All Real Estate Solutions, LLC is a provider of title services.
All Real Estate Solutions, LLC conducts extensive business nationwide, including within the
States of Colorado and Ohio.   All Real Estate Solutions, LLC may be served through its
registered agent, Ann Hughes, 781 Beta Dr., Suite 1, Mayfield Village, Ohio 44143.

37.     Defendant Accurate Title Group, LLC is a North Carolina corporation with its
principal place of business in Ohio.  Accurate Title Group, LLC is a provider of title services.
Accurate Title Group, LLC conducts extensive business nationwide, including within the States
of Colorado and Ohio.  Accurate Title Group, LLC may be served through its registered agent,
Incorp Services Inc., 176 Mine Lake Court, Suite 100, Raleigh, North Carolina 27615.

38.     Defendant Continental REO Services, Inc. is a Missouri corporation with its
principal place of business in Kansas.   Continental REO Services, Inc. is a provider of title
services.   Continental REO Services, Inc. conducts extensive business nationwide, including
within the States of Colorado and Kansas.   Continental REO Services, Inc. may be served
through its registered agent, Vernon D. Singer, 7777 Bonhomme Avenue, St. Louis, Missouri
63105.

39.     Defendant Performance Title, Inc. is a Louisiana corporation with its principal
place of business in Mississippi.   Performance Title, Inc. is a provider of title services.
Performance Title, Inc. conducts extensive business nationwide, including within the States of

Colorado and Mississippi.  Performance Title, Inc. may be served through its registered agent,

Corporation Service Company, 506 South President Street, Jackson, Mississippi 39201.

40.    Defendant SingleSource Property Solutions, LLC ("SingleSource") is a

Pennsylvania corporation with its principal place of business in Pennsylvania.  SingleSource

Property Solutions is a provider of title services.  SingleSource Property Solutions conducts

extensive business in California, Colorado, Florida, Hawaii, Indiana, Iowa, New Hampshire,

North Carolina, Rhode Island, Tennessee, the Commonwealths of Massachusetts and Virginia,

and the District of Columbia.  SingleSource Property Solutions, LLC may be served through its

registered agent, Incorp Services Inc., 1622 Main Street, East Hartford, Connecticut 06108.

41.    Defendant Telsi Real Estate Solutions, LLC is a Delaware corporation with its

principal place of business in California.  Telsi Real Estate Solutions, LLC is a provider of title

services.  Telsi Real Estate Solutions, LLC conducts extensive business in California, Colorado,

Florida, Indiana, Montana, New Hampshire, New York, North Carolina, Rhode Island,

Tennessee, Texas, and the Commonwealth of Virginia.  Telsi Real Estate Solutions, LLC may be

served through its registered agent, CT Corporation System, 818 West Seventh Street, 2nd Floor,

Los Angeles, California 90017.

42.    The defendants named in paragraphs 36 through 41 are hereinafter referred to

collectively as the "other defendants."  The defendants named in paragraphs 15 through 41 are

hereinafter referred to collectively as "Defendants."

### III.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

43.    Any and all acts alleged herein to have been committed by Defendants were

committed by their officers, directors, employees, representatives or agents, who at all times

acted on behalf of their respective defendant(s) and within the course and scope of their employment.

44.    The Fidelity Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior and vicarious liability.  The First American Defendants are also related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior and vicarious liability.

45.    Further, the past, present, and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as single entities at law and equity.

## IV.    SUCCESSOR LIABILITY

46.    Defendant First American Title Insurance Company is the successor-in-interest to Censtar Title Insurance Company and assumed its rights, duties, and liabilities.  In June 2009, Censtar Title Insurance Company merged into First American Title Insurance Company.  First American Title Insurance Company's merger with Censtar Title Insurance Company resulted in the substantial continuity of Censtar Title Insurance Company's business.  Defendant First American Title Insurance Company, as the successor-in-interest to Censtar Title Insurance Company, has assumed Censtar Title Insurance Company's liabilities with respect to this suit.

## V.    JURISDICTION AND VENUE

47.    Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by Defendants, some of which

occurred in the District of Colorado, and because Defendants transact other business within the

District of Colorado.

48.     Defendants are subject to the general and specific personal jurisdiction of this

Court.  Defendants engage in a variety of business activities, including providing title, closing,

and/or escrow services throughout the United States and within the District of Colorado, all of

which they accomplish through their corporate centers, business units, subsidiaries, officers,

directors, employees, and agents.

## VI.     BACKGROUND ON FREDDIE MAC AND FANNIE MAE

### A.     The Role of Freddie Mac and Fannie Mae

#### i.     Public-Private Hybrid

49.     Prior to 2008, Fannie Mae and Freddie Mac were each organized as government-

sponsored enterprises ("GSEs").  Generally speaking, a GSE is a unique hybrid of both public

and private interests.  On one hand, it is treated by the courts and Federal agencies as an

instrumentality of the Federal Government and has many features of a federal agency.  *See, e.g.,*

*Rust v. Johnson*, 597 F.2d 174, 178 (9th Cir. 1979) (affirming that Fannie Mae is a federal

instrumentality); *Paslowski v. Standard Mortg. Corp. of Ga.*, 129 F. Supp. 2d 793, 801–03 (W.D.

Penn. 2000) (concluding Freddie Mac is a federal instrumentality based on the authorizing

statute, 12 U.S.C. 1451 *et seq.*, and Freddie Mac's public purpose); Congressional Budget

Office, U.S. Congress, Federal Subsidies and the Housing GSEs 13 (2001).  It operates under a

federal charter that defines its public purpose and limits its operations.  On the other hand, it is

also structured like a for-profit corporation in that it is overseen by an executive board made up

of members elected by private shareholders.  A GSE traditionally serves two masters—the public

through its federal charter and its private shareholders, for whom it strives to provide a return on their investment.

50.    Congress created both GSEs to fulfill important government purposes.  Fannie Mae was created as a government agency to encourage home ownership following the Great Depression.  Federal National Mortgage Association Charter Act, 52 Stat. 8 (1938).  By purchasing bank mortgages insured by the Federal Housing Authority, Fannie Mae created a secondary market for mortgages, reducing the risk to lenders by getting the loans off their balance sheet and encouraging lenders to extend more home loans.  Because this placed a heavy burden on the U.S. Treasury, Congress converted Fannie Mae into a privately-funded GSE in 1968.  Housing and Urban Development Act of 1968, Pub. L. No. 90-448, 82 Stat. 476, 536-46 (1968).

51.    In 1970, Congress passed the Federal Home Loan Mortgage Corporation Act, creating Freddie Mac.  Pub. L. No. 91-351, 84 Stat. 450 (1970).  Congress had two public purposes behind the act.  First, Freddie Mac would further foster the development of the U.S. housing market by participating in the secondary market for mortgages issued by thrift institutions.  Second, Freddie Mac would compete against Fannie Mae on the secondary market, further driving down mortgage costs.

52.    Before their takeover in 2008, Fannie Mae and Freddie Mac shared some characteristics with federal agencies.  While each was overseen by a board of directors, their charters placed limits on membership.  Five board members must be selected by the President, and must represent different sectors of the housing economy.  While private corporations must conform to regulations promulgated by the Security and Exchange Commission, the two GSEs

20

were not required to do so and were instead overseen by a sub-agency within the U.S. Department of Housing and Urban Development ("HUD"), the Office of Federal Housing Oversight ("OFHEO").

53.    Fannie Mae's and Freddie Mac's status as federal instrumentalities provided certain advantages over purely private enterprises.  Both were exempt from most state income taxes.  Their securities were exempt from many of the federal regulations and fees affecting private securities and enjoyed obligations and benefits similar to securities issued by the U.S. Treasury.  Each had a direct line of credit of $2.25 billion with the U.S. Treasury.  The market read the federal connection as an implicit guarantee by the federal government that it would never let Fannie Mae, Freddie Mac, or their mortgage-backed securities fail.

54.    However, prior to 2008, the GSEs also possessed many characteristics of private corporations.  Each earned a profit, largely through purchasing residential mortgages and privately-issued mortgage-related securities, converting them into mortgage-related securities, and selling them to investors.  They also profited by charging fees to banks in return for guarantying their mortgage loans.  Finally, Fannie Mae and Freddie Mac could lobby Congress on their own behalf and were exempt from Freedom of Information Act requests.

55.    The Federal Government neither owned nor gave money to either GSE.  Instead, each was owned by its shareholders and overseen by a board of directors, the majority of whom were elected by its shareholders.  The board was authorized to elect officers, establish business priorities, and oversee the GSE's operation.  The board was only constrained by federal law, its charter, and its duty to the shareholders.  All investment materials included an express provision

that the securities were neither guaranteed by the federal government nor constituted a federal debt or obligation.

56.     In the years leading up to the financial collapse of the housing market, both Fannie Mae and Freddie Mac were highly profitable.  In 2005 and 2006, Fannie Mae reaped a total profit of $11 billion, while Freddie Mac earned a total of $4.3 billion.  In 2006, the value of Fannie Mae's overall fair assets was $42.2 billion, while Freddie Mac's fair asserts were valued at $31.8 billion..

57.     In 2007, however, investors lost faith in mortgage-backed assets as home prices declined and their mortgages were no longer fully secured by the property's value.  The market for Fannie Mae's and Freddie Mac's securities dried up and the value of their investment portfolios cratered.  By the end of 2007, Fannie Mae had lost $2 billion, while Freddie Mac had lost $3.1 billion.  The value of Fannie Mae's and Freddie Mac's fair assets declined by $13.4 billion and $19.2 billion, respectively.

58.     By the end of 2008, the collapse was total.  While both GSEs held billions in core capital as a safety net at the end of 2007, this would be insufficient to cover their losses.  Fannie Mae's core capital of $45.5 billion at the end of 2007 was well below its 2008 total loss of $58.7 billion.  Freddie Mac held $37.9 billion in core capital at the end of 2007 but lost over $50 billion in 2008 alone.  The fair value of their net assets plunged.  By the end of 2008, Fannie Mae's debt exceeded its assets by over $15 billion, and Freddie Mac's debt exceeded its assets by over $30 billion.  Without the Government's intervention, both Fannie Mae and Freddie Mac likely would have gone into default.

ii.     Freddie Mac and Fannie Mae under Federal Conservatorship

59.     In an attempt to lessen the impact of the housing crisis and save Fannie Mae and Freddie Mac from defaulting on their guarantees, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA").  Pub. L. No. 110–289, 122 Stat. 2654 (2008).  The act created a new oversight agency, the Federal Housing Finance Authority ("FHFA"), to serve as a federal regulator over the struggling GSEs.  On September 7, 2008, the FHFA exercised its authority under HERA and placed Fannie Mae and Freddie Mac under its conservatorship.

60.     Once placed under conservatorship, Fannie Mae and Freddie Mac lost nearly all of their "corporate" benefits, as they were no longer owned and operated by their shareholders. The FHFA took title to all of their assets, capital, property, and obligations, dismissed most of their board of directors and top managers, and assumed the powers of their shareholders and former directors, and officers.  While the shareholders retained ownership of their shares, they would not receive dividend payments, all voting rights were suspended, and the shares were delisted from the New York Stock Exchange.  The conservatees could no longer lobby members of Congress and many of their internal documents were now subject to FOIA requests.

61.     Under HERA, the FHFA has the authority to set the corporate goals and management standards for the conservatees.  While Fannie Mae and Freddie Mac are still responsible for their own day-to-day operations, they are obligated to work towards the goals and business models established by the federal agency.  The FHFA shifted each conservatee's primary focus away from providing the shareholders a return on their investment, instead forcing each conservatee to focus on its original federal purposes.  The FHFA established housing goals for Fannie Mae and Freddie Mac, promulgated regulations to reduce their risk, created strict

23

capital requirements, and limited the types of mortgages they could acquire. It tightened underwriting standards and directed the conservatees to provide greater support for low- and moderate-income housing, regardless of the potential return on these investments.

62.     HERA also authorized the U.S. Treasury and the Federal Reserve to provide Fannie Mae and Freddie Mac additional capital as needed. This took several forms. First, upon request by the FHFA, the Treasury would purchase shares of Senior Preferred Stock in each as necessary to ensure it maintained a positive net worth. This was done in large part to prevent either conservatee from being dismantled, as HERA required Fannie Mae or Freddie Mac go into receivership if its overall equity fell below zero. The conservatees were required to repay the Treasury through quarterly dividends; if they lacked the resources to make the payments, the Treasury would purchase the equivalent amount in preferred stock. The Treasury would receive an option to purchase nearly 80% of all a conservatee's common stock at an excise price of $.00001 a share. Initially, the amount the Treasury could purchase was limited to $100 billion. This limit has since been removed and the Treasury may now purchase an unlimited amount of the preferred stock. Second, the U.S. Treasury established a short-term loan credit facility for Fannie Mae and Freddie Mac, secured by their mortgage-backed securities. Third, the Federal Reserve purchased over $175 billion of Fannie Mae and Freddie Mac's agency debt and over $1.25 trillion of their guaranteed mortgage-backed securities.

63.     Altogether, since Fannie Mae and Freddie Mac went into conservatorship, the Treasury has purchased over $116 billion in preferred stock in Fannie Mae and $72 billion in preferred stock in Freddie Mac. Fannie Mae has repaid only $19.8 billion, while Freddie Mac has repaid only $14.6 billion. In 2009, the Congressional Budget Office ("CBO") began

reporting Fannie Mae's and Freddie Mac's net operating costs in its projections of federal spending. The FHFA, the CBO, the Commodities Futures Trading Commission, and others have opined that the financial relationship between the FHFA, U.S. Treasury, and Federal Reserve amounts to an explicit guarantee of Fannie Mae and Freddie Mac mortgages and securities.

**B.      Contracts between Freddie Mac and Defendants**

64.      In 2006 or 2007, Freddie Mac proposed hiring third parties on a nationwide basis to provide title insurance, escrow, and closing services.[2]  The housing market was beginning to collapse and Freddie Mac was inundated with property foreclosures.  These services included providing a full title report on the property, including any liens, encumbrances, mineral rights, property easements, and other related issues.  In order to identify such exceptions to title, the title insurance provider must examine the title records based on both the names of the previous owners of the property (grantor-grantee information) and the property's legal description. Freddie Mac hoped to contract with providers who had the resources to provide "one stop shopping," or "from cradle to grave services" with as few points of contact as possible. Overwhelmed with foreclosures, Freddie Mac needed service providers with the necessary resources to handle every aspect of the transaction efficiently, competently, and honestly.

65.      First American and Fidelity National Financial, through its subsidiary ServiceLink, both submitted successful bids.  Collectively, the two firms and their subsidiaries provide real estate and title services to Freddie Mac for at least 90% of its foreclosure resales throughout the nation.  Fidelity National Financial and First American have continued to provide these services nationwide either directly or through their subsidiary title agencies and providers.

---

[2] Prior to the housing crisis, Freddie Mac contracted with third parties to perform closing services on an ad-hoc basis.  At that time, ServiceLink was not a Freddie Mac service provider, but First American was.

The contracts apply to real estate transactions in Colorado, California, Florida, Nevada, Arizona, New York, and other states.

66.     The Fidelity Defendants and the First American Defendants, as service providers for Freddie Mac, are required under their contracts with Freddie Mac to conform to Freddie Mac's Single-Family Seller/Servicer Guidelines ("Servicer Guidelines").  The Servicer Guidelines outline the duties, responsibilities, and procedure to be used by all service providers. Moreover, as federal courts have noted, a violation of the Servicer Guidelines constitutes a breach of the provider agreement.  *See, e.g., Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393, 1404 (N.D. Ala. 1997) ("[T]he [Servicer Guidelines] is a contract between [Freddie Mac] and each entity that sells mortgages to or services mortgages for [Freddie Mac].).

67.     Defendants' contracts with Freddie Mac, as outlined in the Provider Agreements and the Servicer Guidelines, specifically require full and exhaustive title searches.  With regard to a foreclosure resale, a service provider is required to ensure a property's title is free from all encumbrances and liens other than those disclosed to and accepted by the buyer.  *See* Freddie Mac, Freddie Mac's Single-Family Seller/Servicer Guidelines Ch.66.1 ("Freddie Mac requires the Servicer to manage the foreclosure process to acquire clear and marketable title to the property in a cost-effective, expeditious, and efficient manner.").  For title opinions provided by an attorney in particular, the Servicer Guidelines require the provider to include and address all title exceptions that would affect the property's value, such as private liens, encumbrances, or mineral rights.  *See* II Freddie Mac, Freddie Mac's Single-Family Seller/Servicer Guidelines Ch.39.3.

26

68.     To meet these requirements under the Service Guidelines, whether an attorney or otherwise, the servicer must perform a full and exhaustive search by legal description to provide a record of any adverse liens, encumbrances, mineral rights ownership, zoning conflicts, to name a few, because a grantor/grantee search would not reveal these property defects.

69.     Under their contracts with Freddie Mac, as outlined in the Provider Agreements and the Servicer Guidelines, Defendants further are required to comply with all applicable "federal, State and local laws, ordinances, regulations and orders," including RESPA, in fulfilling its obligations.  *See* I Freddie Mac, Freddie Mac's Single-Family Seller/Servicer Guidelines Ch. 6.2.

70.     The Servicer Guidelines also include provisions that expressly apply to Fidelity within the scope of REO properties, and apply to actions by its employees, agents, and outside firms working on its behalf.  *See* I Freddie Mac, Freddie Mac's Single-Family Seller/Servicer Guidelines Ch. 4.7.  The Servicer Guidelines require that Fidelity protect Freddie Mac from any loss as a result of "dishonesty, theft, and/or fraud"; the protection is not limited to acts done only for personal gain.  *Id.*  The provisions also give Freddie Mac the right to bring a claim against Fidelity for "any losses Freddie Mac incurs in connection with the acts covered by insurance." *Id.*

## VII.    THE HOME BUYING PROCESS

### A.    Title Insurance or "Owner's Policies"

71.     When buying a home, buyers typically take out title insurance, also known as an "owner's policy," prior to closing on the property in order to protect themselves in the event that the seller fails to disclose liens and encumbrances, or in the event that the seller did not legally

own the property.  Title insurance does not, however, cover encumbrances on the property discovered in previously recorded documents, such as agreements and deeds; such encumbrances are listed on Schedule B-II of the title commitment as exceptions to the policy's coverage.

72.     Before issuing a title commitment, a title searcher, also known as an abstractor, searches for existing encumbrances on the property, such as liens, covenants, and easements. There are several ways to search for this information.  The abstractor begins by looking at the encumbrances included in the most recent policy or vesting deed.  The abstractor then looks for additional encumbrances on the property by searching the county records, which are often available online, for the names of the grantor and grantee in the current vesting deed.  This grantor/grantee search is so simple that an abstractor could conduct one anywhere.  These searches are limited, but sufficient for certain purposes, such as the refinancing of a mortgage to the original mortgage holder, when it is not necessary to discover or re-discover all liens or encumbrances on a property.  The cost of a grantor/grantee search alone ranges from $115 to $175.

73.     When a home is being purchased by a new owner, however, a more thorough search is required.  In that case, a diligent abstractor complying with regulations and industry standards and guidelines will run a more exhaustive search using the property's legal description in order to determine whether there are property-specific encumbrances, such as an easement allowing a telephone company to operate and maintain telephone wires, or the location of a SuperFund site.  This type of search should be included in an owner's policy in addition to the grantor/grantee search.  A proper owner's policy with both of these searches requires use of a

specialized private, proprietary databank, usually located within the county of the property at
issue. It can cost from $521 to $1,285.

74.    As an example, some title companies located in the metropolitan Denver area
utilize a system known as "SKLD" to research a property prior to issuing a title commitment.
SKLD is a subscription-only online system that contains 38.5 million records and over 26
million document images for properties located within the fourteen largest counties in Colorado.
It is the only comprehensive property records databank for the area, and it enables members to
use a property's legal description to find all restrictions on the use of a property. SKLD is the
only resource for title companies in the metropolitan Denver area who wish to conduct a diligent
and comprehensive title search. In order to gain access to SKLD, a title company must pay the
cost of membership, which begins with a fee of over $2 million.

75.    First American, and Fidelity National Financial, through its subsidiary
ServiceLink, each contracted with Freddie Mac to provide complete title services, including
owner's policies. They only searched the names of the grantor and grantee in the current vesting
deed, however, as is described in more detail below. In fact, they often lacked access to any
fuller search. For example, ServiceLink is not a member of SLKD—the only database through
which searches by a property's legal description may be conducted for properties in fourteen
counties in Colorado, including those comprising the City of Denver. Yet ServiceLink purported
to provide full title searches on properties located in the metropolitan Denver area. Likewise,
any title searches conducted by Denver-area agents working on behalf of First American who
were not members of SKLD were shams as well.

76.    As a result of ServiceLink's and certain First American agents' sole reliance on "toilet-bowl searches," they failed to make buyers and sellers aware of encumbrances on the property that show up only through a full search of the property's legal description.

**B.    Closing Fees**

77.    The process of purchasing a home involves more parties than just a buyer and a seller.  The modern real estate sale may include an attorney, a title company, an escrow agent, an appraiser, local inspectors, and notaries, among others.  Each of these parties will assess fees for its services.  In addition, the buyer will likely need to purchase various warranties and insurance to protect the lien holder's secured interest in the property.  These fees and services are referred to as "closing fees" as they are typically paid at the "closing," which is when the contracts are finalized, the loan monies are released by the bank, and all outstanding fees and debts are paid. Closing fees are regulated by state and federal law.

**C.    RESPA**

78.    The Real Estate Settlement Procedures Act ("RESPA") was passed in 1974 to educate the buyer about the costs involved in purchasing real estate.  Pub. L. No. 93-533, 88 Stat. 1724 (1974).  Congress hoped that by requiring lenders and service providers to fully disclose all their fees and prohibiting false fraudulent fees, including fees for which no correlative service was done, under-educated or inexperienced buyers would be put on a more level playing field when negotiating real estate sales contracts.  This would allow more buyers to make informed choices in a competitive market, lowering overall real estate costs.

79.    RESPA applies to all transactions involving a "federally related mortgage loan," which would apply to any loan creating a lien on a one- to four-family residential property.

Disclosures must be made at several points in the transaction—when the buyer first applies for the loan, when the loan is closed or transferred to another lien holder, and when seeking escrow services. For example, at least one day before the loan is closed, the lender or service provider must provide the seller a "Uniform Settlement Statement," typically on a HUD-1 or a HUD-1A form depending on the type of loan. The HUD-1 is meant to clearly disclose and explain all fees and monies involved in the closing. Section 8 of RESPA prohibits the lender from charging unearned fees and kickbacks.

80.     HUD, the agency charged with enforcing and interpreting the provisions of RESPA, has interpreted section 8 as prohibiting lenders or service providers from charging fees for which no correlative service was provided[3] and from providing kickbacks to third parties for referrals. Individuals or entities in violation of section 8 may be fined no more than $10,000, face up to a year's imprisonment, or both. In addition, a Federal or State agency or official may seek an injunction to require compliance. A RESPA violation may also be grounds for an administrative action by the HUD Mortgagee Review board.

### VIII.   DEFENDANTS' SCHEME TO DEFRAUD THE GOVERNMENT

**A.     Relator's Discovery of the Title Search Fraud and Subsequent Retaliation**

81.     Dale Todd has worked in the title insurance business for many years. In 2005, Todd was employed with First American Heritage Title Company in Denver, Colorado when Fidelity National Title Insurance Company recruited him to open their first Colorado residential

---

[3] This issue is pending before the United States Supreme Court in *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799 (5th Cir. 2010), *cert. granted*, 132 S. Ct. 397 (U.S. Oct. 11, 2011) (No.10-1042) (reviewing a split amongst the circuit courts as to whether RESPA applies when an unearned fee is wholly kept by the service provider and not shared with a third party as a kickback).

division.  As Vice President, Sales and Escrow Manager, he built that division from the ground up.  It quickly became profitable.

82.    While attending an industry conference in Dallas, Texas in September 2007, Todd ran into Tish Ledbetter, Freddie Mac's Manager of Customer & Supplier Relations.  In the mid-to-late 1980s, when Ledbetter was an Asset Manager with Freddie Mac and Todd was an Account Manager with Security Title Guaranty, Todd had insured and closed all of Ledbetter's Colorado real-estate owned (owned by the lender after foreclosure) properties.  Ledbetter told Todd at the conference that Freddie Mac was about to stop using Defendant ServiceLink (a Fidelity Defendant) in Colorado, because it was "melting down" due to multiple problems with ServiceLink's provision of services, including title searches.  Ledbetter asked Todd to assist in resolving some of Freddie Mac's concerns about ServiceLink.

83.    Todd contacted Linda Preston, Senior Vice President, Performance Management, at ServiceLink and offered to assist with the Freddie Mac closings in Colorado.  At first, Preston declined his offer.  Todd then mentioned that Ledbetter had asked him to get involved.  Preston finally agreed to meet with Todd at his office, where Todd made a presentation.  Again, however, Preston rebuffed his proposal.  Todd then told Preston that he would meet with Ledbetter personally to discuss his taking over Freddie Mac's closing business in Colorado.  Soon thereafter, Doug Ashe, CEO of ServiceLink, telephoned Todd and let him know that ServiceLink would give Todd some of its closing business in Colorado.  Although Todd would perform the closing services, ServiceLink would still issue the title insurance.

84.    In October or November 2007, Todd flew to Pittsburgh to attend ServiceLink's training session on property closings.  Todd and the other attendees toured ServiceLink's

operations and discussed the methods and records that ServiceLink uses to research property prior to issuing a title commitment. When ServiceLink's Chief Title Officer told the group that ServiceLink generates title commitments by simply sending an abstractor to the local county clerk's office to search the names of the grantor and grantee on the most recent deed for the property, Todd asked how ServiceLink develops and maintains a property's exceptions. The Chief Title Officer chuckled and said, "We just throw on a bunch of garbage exceptions and send it out," meaning that ServiceLink only inserted generic exceptions applicable to any property rather than "property-specific" exceptions only applicable to the insured property, such as an easement or covenant. Todd was stunned.

85.    ServiceLink's website points to access to a Fidelity-owned plant upon which it supposedly relies for title searches, but Todd learned from working with ServiceLink that the database it calls a plant can identify only non-property specific and "garbage" exceptions. As the examples below reveal, the database is essentially worthless.

86.    After returning from Pittsburgh, Todd obtained several of ServiceLink's closed files and reviewed the title commitments and HUD forms. He saw that ServiceLink's title commitments did in fact contain mostly "garbage exceptions," as opposed to property-specific exceptions that the abstractor would discover only by searching a property's legal description. In November 2007, Todd discovered that companies in addition to ServiceLink were doing shoddy title work as well. After receiving a brochure from the Kennedy Wilson Auction Group regarding an auction of bank-owned properties in Colorado, Todd visited the Kennedy Wilson website, which listed the title commitments for ninety-seven of the properties. The title commitments were issued by Colorado American Title, an agent for First American Title

Insurance Company.  Todd compared the exceptions on the title commitments issued by Colorado American Title to the exceptions listed in the SLKD database and found them to be mostly "garbage" exceptions.

87.    Todd continued to investigate, and by the end of 2007, he had examined over 150 title commitments prepared by ServiceLink and Colorado American Title on behalf of First American Title Insurance Company.  Todd compared multiple ServiceLink title commitments to commitments he generated using Fidelity National Title Insurance Company's database[4] and found that the majority of ServiceLink's title commitments did not contain the property-specific exceptions found on Fidelity National Title Insurance Company's commitments for the same property.  For example, ServiceLink issued a title commitment in July 2007 to Buyer 1 for a property located in Denver, Colorado.  (Ex. 1, Property 1 ServiceLink Commitment.)[5]  Todd compared ServiceLink's title commitment to the commitment generated by Fidelity National Title Insurance Company and discovered that the ServiceLink commitment failed to include three property-specific terms, conditions, provisions, agreements, and obligations included in Fidelity's commitment.  (*See id.*; Ex. 2, Property 1 Fidelity Commitment.) ServiceLink also failed to include two easements and an amendment to the property's covenants, conditions, lien rights, and restrictions.  (Ex. 1, Property 1 ServiceLink Commitment.)

88.    In early 2008, Todd prepared a report entitled "Analysis of Title Agencies" in which he cited examples of substandard work product from title agencies owned by or working on behalf of First American Title Insurance Company and Fidelity National Title Insurance

---

[4] In his position, he had the ability to research and issue title commitments.

[5] All exhibits and their references have been redacted with regard to any nonpublic personal information.

Company.  (Ex. 3, Analysis of Title Agencies.)  In his report, Todd discussed ServiceLink's

failure to comply with Colorado statutes and regulations, which posed harm to buyers, sellers,

and lenders due to lack of performance, substandard product, and disclosure.  (*Id.*)  Todd stated

that most of the title commitments created by Colorado American Title on behalf of First

American Title Insurance Company contained only general "garbage" exceptions, were missing

recording information for the plats, and were missing important property-specific documents

related to the properties.  (*Id.*)  After Todd presented his analysis to Darren Hone, then

Operations Manager of Fidelity Title Insurance for Colorado, Hone told Todd that he only

handled the commercial side of the business, not residential, and told Todd to take his report

elsewhere.

        89.    Todd then sent his analysis and an email to Don Dubois, Fidelity National

Financial's Executive Vice President for the Western Region.  (Ex. 4, Email from Todd to

Dubois.)  Todd informed Dubois that ServiceLink had "no title plant, background/base files to

work with.  They farm out a search for limited information to prepare the commitment similar to

a limited short form title policy for a refinance title order.  They are wholly incapable of

producing a title commitment in Colorado for a purchase transaction."  (*Id.*)  Todd stated that if

ServiceLink's poor work product were "brought to the attention of Freddie Mac, it is all but

certain they would fire FNF. We are actually putting them [Freddie Mac] in jeopardy."  (*Id.*)

Todd continued, "Issuing a commitment/policy now and then with general, garbage exceptions

*mayor* [sic] *may not* open us up to an issue/claim in the future, issuing them as standard practice

for a major client with a big bull's eye on it [Freddie Mac] opens us up to class action lawsuit

status; if and when the wrong legal counsel discovers it."  (*Id.*)  Dubois never responded to Todd

35

regarding his email or his analysis.  Several months later, however, Dubois asked Todd to step down from Sales and Escrow and focus on developing business; Todd still retained the title of Vice President.

90.    In mid-2008, Todd sent his analysis to Paul Perez, Chief Compliance Officer for Fidelity National Title Group.  After receiving no response from Perez, Todd emailed him again in March 2009 and requested a response to his analysis.  Todd told Perez that if he did not hear back from him, he would send the analysis to Bill Foley, Chairman of the Board of Directors for Fidelity National Financial.  Perez immediately contacted Todd's supervisor and arranged a meeting with Todd in Jacksonville, Florida.

91.    Perez arranged for a April 2, 2009 meeting at Fidelity National Title Insurance Company's headquarters in Jacksonville.  Attending were Perez, Todd, Jan Kailey, Vice President of Residential Operations, and others.  At the conclusion of the meeting, Todd flew home to Denver with nothing resolved.

92.    In January 2010, Todd met with John Longo, President of Fidelity National Title Insurance Company, and Lambos Gianos, Executive Vice President of Fidelity National Title Insurance Company.  Longo and Gianos focused the meeting on ServiceLink and assured Todd that they would "support" him in any way necessary to retain the account, because of the "enormous" revenue.  Longo and Gianos then told Todd that they were demoting him from Vice President to an account manager. They reduced his salary from $4,500.00 per month to $4,000.00 per month, cut his commission from 20% on revenue over $20,000 a month to 10% on revenue over $20,000.00 a month, and decreased his car allowance from $500.00 per month to $400.00 per month.

36

93.     In March 2010, Todd's supervisor, Lou Italiano, informed Todd that Longo and Gianos cut his salary again, this time from $4,000.00 per month to $3,000.00 per month.

94.     On February 22, 2011, Todd met with Longo to discuss ServiceLink.  Todd told Longo that he was concerned about the legal liability posed by ServiceLink's inadequate title searches.  Longo told Todd that if his allegations regarding ServiceLink were true, he would "fire ServiceLink, because he has high standards," but Longo never did anything to address Todd's allegations and concerns.

95.     In June 2011, Longo set up a meeting with Todd and Italiano. Longo informed Todd that he was taking away his car allowance and salary and moving him to straight commission.  Longo then told Todd he could no longer work on the ServiceLink account, which had comprised roughly ninety percent of Todd's monthly revenue.  Thus, in little more than a year, Fidelity National Title Insurance Company completely eliminated Todd's salary and car allowance and took away nearly all of his commission payments.  Todd remains with the company today, but even his access to title plant records has been stripped away; once head of the office, today he cannot even run a title search.

**B.      Bad Title Searches on Freddie Mac-Owned Properties**

96.     During the course of his investigation, Todd found that ServiceLink provided only "toilet-bowl" searches and "garbage exceptions."   In each of the following instances, ServiceLink charged Freddie Mac for "owner's policies" in amounts ranging from $521 to $1,285.  The so-called "owner's policies" provided by ServiceLink however, were similar to products containing only grantor/grantee searches provided in Colorado for which ServiceLink charged $115 to $175.

97.     On December 24, 2007, ServiceLink issued a title commitment for seller Freddie

Mac and Buyer 2 for a property located in Littleton, Colorado.  (Ex. 5, Property 2 ServiceLink

Commitment.)  Todd compared ServiceLink's title commitment to the commitment prepared by

Fidelity National Title Insurance Company, dated March 25, 2008, and discovered that the

ServiceLink commitment showed only one property-specific exception.  (*See id.*; Ex. 6, Property

2 Fidelity Title Commitment.)  ServiceLink failed to include three property-specific covenants,

conditions, and restrictions, an easement for utilities granted to Mountain States Telephone and

Telegraph Company, and one recording on the plat of Acres of Green Filing No. 4, all of which

the Fidelity National Title Insurance Company commitment contains. (Ex. 5, Property 2

ServiceLink Commitment; Ex. 6, Property 2 Fidelity Title Commitment.)

98.     On January 17, 2008, ServiceLink issued a title commitment for seller Freddie

Mac and Buyer 3 for a property located in Aurora, Colorado.  (Ex. 7, Property 3 ServiceLink

Title Commitment.)  In comparing ServiceLink's title commitment to the commitment issued by

Fidelity National Title Insurance Company, dated March 24, 2008, Todd discovered that the

ServiceLink commitment contained thirteen exceptions, eleven of which are "garbage

exceptions" and only two of which are property-specific.  (*See id.*; Ex. 8, Property 3 Fidelity

Title Commitment.)  The Fidelity National Title Insurance Company commitment, however,

contained twenty-eight exceptions and cited thirty-four recorded documents affecting the use and

enjoyment of the property.  (Ex. 8, Property 3 Fidelity Title Commitment.)  Among other things,

the ServiceLink commitment failed to disclose that the property is within close proximity of a

toxic waste site, the Denver Arapahoe Disposal Site, by including an exception as to the terms,

conditions, provisions, agreements, and obligations specified under the Landfill Proximity

38

Notice – Murphy Creek.  (*See id.*; Ex. 7, Property 3 ServiceLink Title Commitment.)  The ServiceLink commitment also failed to include an exception exempting the Silverado Investment Company from liability for past use of the land.  Unbeknownst to the buyers, the property was once used as a bombing range by Buckley National Air Guard and Lowry Air Force Base during World War II and the Korean War.  (*See* Ex. 7, Property 3 ServiceLink Title Commitment; Ex. 8, Property 3 Fidelity Title Commitment.)

99.    On March 13, 2008, ServiceLink issued a title commitment for seller Freddie Mac and Buyer 4 for a property located in Aurora, Colorado.  (Ex. 9, Property 4 ServiceLink Title Commitment.)  Todd compared ServiceLink's title commitment to the commitment prepared by Fidelity National Title Insurance Company, dated March 24, 2008, and discovered that the ServiceLink commitment listed only "garbage exceptions" and contained absolutely no property-specific exceptions.  (*See id.*; Ex. 10 Property 4 Fidelity Title Commitment.)  ServiceLink failed to include two exceptions related to mineral rights, three covenants, conditions, and restrictions, and two recordings on the apartment complex plat, all of which the Fidelity National Title Insurance Company commitment contained.   (*See* Ex. 9, Property 4 ServiceLink Title Commitment; Ex. 10, Property 4 Fidelity Title Commitment.)  The ServiceLink commitment even contained an incomplete legal description of the property.  (*See* Ex. 9, Property 4 ServiceLink Title Commitment.)  Furthermore, Fidelity National Title Insurance Company's search showed that the previous deed between Freddie Mac and Aurora Loan Servicing was not executed according to Colorado state law.  (*See* Ex. 10 Property 4 Fidelity Title Commitment.)  ServiceLink failed to uncover this and listed Freddie Mac as the legal owner, which created a defect in the property's chain of title.  (*See* Ex. 9, Property 4 ServiceLink Title Commitment.)

100.    ServiceLink's failure to provide the service contracted for caused at least one buyer severe economic harm and emotional distress.  On November 18, 2008, ServiceLink issued a title commitment for seller Freddie Mac and Buyer 5 for a condominium located in Denver, Colorado.  (Ex. 11, Property 5 ServiceLink Title Commitment.)  ServiceLink's "toilet-bowl" search failed to pick up a lis pendens[6] filed by the homeowners association.  (*Id.*; Ex. 12, Email from Todd to Perez.)  ServiceLink also failed to find a Sheriff's Certificate of Purchase recorded on November 3, 2008, after the property had been sold via judicial foreclosure.  (Ex. 11, Property 5 ServiceLink Title Commitment; Ex. 12, Email from Todd to Perez.)  The legal owner of the property posted a Demand for Possession on May 5, 2009, forcing Buyer 5 to vacate the property within three days.  (Ex. 13, Property 5 Demand for Possession.)  The legal owner offered to sell Buyer 5 the property back for $272,000, but upon learning that Buyer 5 had spent thousands of dollars remodeling the home, it increased the asking price to $300,000. (Ex. 12, Email from Todd to Perez.)

## C.    Closing Fees Related to Freddie-Mac Owned Properties

### i.    State Laws and Closing Rates

101.    Methods of regulating closing rates vary from state to state.  Some states, including Florida, Iowa, and New Mexico, set the maximum closing rate that title insurance companies are allowed to charge.  Fla. Stat. § 627.782; Iowa Code § 16.91; N.M. Stat. § 59A-30-6.  The District of Columbia requires insurance companies to file closing rates with the Department of Insurance.  D.C. Code § 31-5031.17.  Multiple states, including California, Delaware, Georgia, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New York, and

---

[6] A lis pendens is written notice to the owner of a property and potential buyers that a lawsuit has been filed involving an interest in the property.  It is filed with the clerk of the court and recorded in county records.

Tennessee, also require title insurance companies to file closing rates with the state. Cal. Ins. Code § 12401 *et seq.*; Del. Code Ann. Tit. 18 § 2504; Ga. Code Ann. § 33-6-5(6); Minn. Stat. § 68A.04; Mont. Code Ann. § 33-25-212; Nev. Rev. Stat. § 692A.120; N.H. Rev. Stat. Ann. § 416-A:A17; N.J. Stat. Ann. § 17:46B-42; N.Y. Ins. Law § 6409; Tenn. Code Ann. § 56-35-11. Rhode Island began requiring title insurance companies to file closing rates on January 1, 2011, and prohibited excessive and unfairly discriminatory rates prior to that. R.I. Gen. Laws §§ 27-2.6-16 and 27-44-5.

102.    Wisconsin and the Commonwealth of Virginia do not require title insurance companies to file rates with any state agency, but Wisconsin prohibits excessive or unfairly discriminatory rates, and the Commonwealth of Virginia requires title insurance companies to charge "reasonable" rates. Wis. Stat. § 652.12; Va. Code Ann. § 38.2-4608. North Carolina also does not require title insurance companies to file closing rates, but it does regulate how companies may set their rates. N.C. Gen. Stat. § 58-26-1. Hawaii requires title insurance companies to publish a schedule of rates for the public. Haw. Rev. Stat. § 431:20-120. Illinois and the City of Chicago do not require title insurance companies to file closing rates and prohibit the Secretary of the Department of Insurance from setting or adjusting rates. 215 Ill. Comp. Stat. 155/19. Indiana does not require title insurance companies to file closing rates and exempts title insurance companies from its statute regulating insurance companies. Ind. Code §§ 27-1-22-2, 27-1-20-29. Oklahoma and the Commonwealth of Massachusetts appear to lack regulations on closing rates.

      ii.      **Overcharging**

      (a)      **Real Estate Closing Fees**

103.    The Fidelity Defendants charge multiple fees for buying and selling a property, including a real estate closing fee.  The real estate closing fee covers several different services, such as creating and filing the vesting deed, preparing closing documents, and notarizing the documents as needed.  The Fidelity Defendants require Freddie Mac to pay the real estate closing fee in its entirety, while splitting the real estate closing fee in transactions not involving Freddie Mac.  It is standard practice in the industry to split the real estate closing fee between the buyer and the seller, regardless of whether Freddie Mac is a party.

104.    Not only did the Fidelity Defendants shoulder Freddie Mac with the whole real estate closing fee, but they consistently charged Freddie Mac more than the real estate closing fee stated in its schedule of fees and charges, which is variable from region to region.  In early 2008, Todd noticed that Fidelity National Title Insurance Company charged Freddie Mac a higher real estate closing fee than the rate on file with the State of Colorado.  Todd said nothing, believing that the rate charged Freddie Mac was set at a national level and that the Colorado rate did not apply.  In December 2008, Todd asked the accounting department about the high real estate closing fee and was told that Fidelity National Title Insurance Company did not have a "national" rate for Freddie Mac.  Fidelity National Title Insurance Company should have been charging Freddie Mac no more than the real estate closing fee on file with Colorado.

105.    For example, from December 2005 to May 27, 2010, the Fidelity Defendants set the real estate closing fee at $240.00 for the metropolitan Denver area, but charged Freddie Mac a whopping $745.00 real estate closing fee per transaction.  On May 27, 2010, the Fidelity

Defendants increased the real estate closing fee to $250.00 for the metropolitan Denver area, but charged Freddie Mac a $595.00 real estate closing fee per transaction.  On March 28, 2011, the Fidelity Defendants further increased the real estate closing fee to $300.00 for the metropolitan Denver area, yet continue to charge Freddie Mac a $595.00 real estate closing fee.

      **(b)**      **Loan Closing Fees**

106.    In 2009 and early 2010, the Fidelity Defendants charged a separate loan closing fee whenever a buyer took out a loan to purchase the property.  The fee covered the cost of preparing a HUD1 settlement statement, printing and presenting the loan package for signatures, disbursing loan proceeds, recording the deed of trust, and notarizing the documents as needed. On February 15, 2011, John Longo told Todd in an email that Fidelity National Title Insurance Company rolled the loan closing fee into Freddie Mac's real estate closing fee.  (Ex. 14, Email from Longo to Todd.)  Longo wrote, "We appear to be consistent in collecting $595.00 for a closing fee (Combined Real Estate Closing fee of $260.00 plus a loan closing fee of $325.00) and $150.00 for a signing fee."  (*Id.*)  Yet Fidelity National Title Insurance Company represented to Freddie Mac that it was charging only a real estate closing fee, in violation of RESPA, Housing and Urban Development regulations, and industry guidelines.  *See* 12 U.S.C. § 2607(b); 24 C.F.R. § 3500.14.

107.    Upon receiving Longo's email, Todd looked at several settlement statements and saw that Fidelity National Title Insurance Company consistently charged Freddie Mac the same real estate closing fee for transactions involving a loan as it did for cash-only purchases.  In other words, Todd discovered that Fidelity National Title Insurance Company charged Freddie Mac *loan* closing fees in connection with *cash* purchases.  Because the purchases did not include a

loan, no loan closing fee should have been included.  Approximately 20–28% of Freddie Mac's

sales are to cash buyers.  Charging a fee for which no service is provided in connection with a

transaction involving a federally related mortgage loan violates RESPA.  *See* 12 U.S.C. §

2607(b); 24 C.F.R. § 3500.14.

(c)      <strong>Notary Fees</strong>

108.    For most of 2009, the Fidelity Defendants charged Freddie Mac a $60.00 notary

fee in every foreclosure closing, even though absolutely no materials were in need of

notarization and no materials were actually notarized.  *See* 12 U.S.C. § 2607(b); 24 C.F.R. §

3500.14.  Even if documents needed to be notarized, the cost of doing so was already included in

the real estate closing fee.  In late 2009, Todd discovered the fraud and instructed the closers at

Fidelity National Title Insurance Company in Colorado to stop charging the $60.00 fee, because

they were not notarizing any documents.  They acceded to his request.

(d)      <strong>Signing Fee and Document Processing and Delivery Fee</strong>

109.    The Fidelity Defendants also charged Freddie Mac a $150.00 signing fee and a

$150.00 document processing and delivery fee, the latter of which it concealed within the real

estate closing fee in 2009 and early 2010.  For example, from December 2005 to May 27, 2010,

Fidelity National Title Insurance Company in metropolitan Denver charged Freddie Mac a

$745.00 real estate closing fee and did not itemize the $150.00 document processing and delivery

fee.  When Fidelity National Title Insurance Company in metropolitan Denver began charging

Freddie Mac a $595.00 real estate closing fee instead of a $745.00 real estate closing fee, it

added a $150.00 document processing and delivery fee to the list of Freddie Mac's fees.

110.    Deliberately misleading Freddie Mac by concealing the $150.00 document processing and delivery fee within a separate fee violates RESPA, Housing and Urban Development regulations, and industry guidelines.  *See* 12 U.S.C. § 2607(b); 24 C.F.R. § 3500.14.

111.    Furthermore, Freddie Mac did not authorize the $150.00 document processing and delivery fee.  ServiceLink knew this, but charged Freddie Mac the fee anyway.  On January 31, 2011, Anita Huxoll, an Escrow Officer with Fidelity National Title Insurance Company, wrote Todd and stated, "They [ServiceLink] said the extra $150.00 should have been going to ServiceLink and that Freddie Mac did not allow any additional closing fees on top of the $595.00 and $150.00 [signing fee]."  (Ex. 15, Email from Huxoll to Todd.)  A January 3, 2011 invoice for closing costs associated with the sale of a property located in Evergreen, Colorado shows, however, that ServiceLink charged Freddie Mac a $150.00 document processing and delivery fee in addition to the $595.00 real estate closing fee and the $150.00 signing fee.  (Ex. 16, Property 6 Invoice.)

**iii.    Examples of Fraudulent Closing Fees**

112.    On November 30, 2009, Security Title Guaranty Company collected fees from Freddie Mac associated with closing on a property located in Fort Collins, Colorado.  (Ex. 17, Property 7 Sellers Closing Statement.) Freddie Mac paid Security Title Guaranty Company a $745.00 real estate closing fee.[7]  (*Id.*)  As stated above, the maximum real estate closing fee permitted by the State of Colorado for the metropolitan Denver area was $240.

---

[7] Freddie Mac also paid ServiceLink a $60.00 document preparation fee, an additional closing fee that Freddie Mac did not allow.

113.    On December 29, 2009, Security Title Guaranty Company collected fees associated with closing on a property located in Aurora, Colorado.  (Ex. 18, Property 8 Sellers Closing Statement.)  Freddie Mac sold the property to Buyer 8, who borrowed $78,659.00 from Wells Fargo to make the purchase.  (*Id.*)  The Federal Housing Administration had provided mortgage insurance on the loan.  (*Id.*)  Freddie Mac paid Security Title Guaranty Company a $745.00 real estate closing fee.[8]  (*Id.*)  Again, the maximum real estate closing fee allowed by the State of Colorado for the metropolitan Denver area was $240.

114.    On January 21, 2010, Security Title Guaranty Company collected fees from Freddie Mac associated with closing on a property located in Centennial, Colorado.  (Ex. 19, Property 9 Sellers Closing Statement.)  Freddie Mac paid Security Title Guaranty Company a $745.00 real estate closing fee, $505 more than the $240 permitted by the State of Colorado for the metropolitan Denver area.[9]  (*See id.*)

115.    On January 25, 2010, Security Title Guaranty Company collected fees associated with closing on a property located in Centennial, Colorado.  Freddie Mac sold the property to Buyer 10, who borrowed $187,540.00 from Cherry Creek Mortgage Co., Inc. to make the purchase.  (Ex. 20, Property 10 Sellers Closing Statement.)  The Federal Housing Administration provided mortgage insurance on the loan.  (*Id.*)  Freddie Mac paid Security Title Guaranty

---

[8] Freddie Mac further paid ServiceLink $945.00 for an "owner's policy," but only received a grantor/grantee search worth $115 to $175.  (*See* Ex. 18, Property 8 Sellers Closing Statement.)

[9] Freddie Mac also paid ServiceLink $1,285.00 for an "owner's policy" that only contained a $115 to $175 grantor/grantee search.  (*See* Ex. 19, Property 9 Sellers Closing Statement.)

Company a $745.00 real estate closing fee.[10]  (*Id.*)  The maximum real estate closing fee allowed for the metropolitan Denver area was $240.

116.    On February 25, 2010, Security Title Guaranty Company collected fees associated with closing on a property located in Aurora, Colorado.  (Ex. 21, Property 11 Sellers Closing Statement.)  Freddie Mac sold the property to Buyer 11, who borrowed $216,015.00 from Universal Lending Corporation to make the purchase.  (*Id.*)  The Federal Housing Administration provided mortgage insurance on the loan. (*Id.*)  Freddie Mac paid Security Title Guaranty Company a $745.00 real estate closing fee, again, more than the $240 permitted by the State of Colorado for the metropolitan Denver area.[11]  (*See id.*)

117.    In summary, Defendants wrongfully charge Freddie Mac for title searches that were not performed and for various closing fees not permitted or in excess of that permitted by Freddie Mac or state law or for services that were not performed.  On a typical foreclosure resale, Freddie Mac pays five wrongly added charges:  (1) title search fees (up to $1,285); (2) real estate closing fees (average overcharge $345); (3) loan closing fee ($325); (4) notary fee ($60); (5) document processing and delivery fee ($150).  The total of these charges is $2,165.

**D.    Bad Title Searches on Properties Guaranteed by the Government**

118.    Todd also discovered that the Fidelity Defendants, the First American Defendants, All Real Estate Solutions, LLC, Accurate Title Group, LLC, Continental REO Services, Inc., Performance Title, Inc., SingleSource Property Solutions, LLC, and Telsi Real Estate Solutions, LLC provide only "toilet-bowl" searches and "garbage exceptions" for properties guaranteed by

---

[10] Freddie Mac further paid ServiceLink $1,174.00 for an "owner's policy," which only included a grantor/grantee search worth $115 to $175.  (*See* Ex. 20, Property 10 Sellers Closing Statement.)

[11] Freddie Mac also paid ServiceLink $1,220.00 for an "owner's policy" that contained only a $115 to $175 grantor/grantee search.  (*See* Ex. 21, Property 11 Sellers Closing Statement.)

the Government—through Freddie Mac, Fannie Mae, the FHA, and the VA.  All of these defendants handle foreclosure resales nationwide, 90% of which are guaranteed by Freddie Mac, Fannie Mae, the VA, and the FHA.  These governmental agencies and instrumentalities issue mortgage loan guarantees on these properties based, in part, on Defendants' assurances of good title.  Many of these properties either have been or will be subject to foreclosure, resulting in claims made on the governmental guarantees.

119.    As an example, on November 14, 2007, First American Title Insurance Company issued a title commitment for seller Countrywide Bank and Buyer 13 for a townhome located in Denver, Colorado.  (Ex. 24, Property 13 First American Title Commitment, Ex. 25, Property 13 Deed of Trust.)  The buyers purchased the property with the help of a loan guaranteed by the FHA.  (Ex. 25, Property 13 Deed of Trust.)  First American Title Insurance Company's title commitment fails to include multiple property-specific exceptions, including those found within a May 5, 1999 Warranty Deed for the property.   (Ex. 26, Property 13 Warranty Deed.)  First American's title commitment does not even cite the Declaration of Covenants, Conditions, and Restrictions of Kensington Townhomes, which contains a "blanket" utility easement for the "installation, replacement, repair, operation and maintenance of utilities, including but not limited to water, sewer, gas, telephone, electricity, and satellite and cable systems.  Said blanket easement includes future utility services not presently available to the Planned Community that may reasonably be required in the future."  (Ex. 27, Property 13 CCRs at 35.)  Thus, First American's title searches on these guaranteed loans are no better than those they perform on Freddie Mac-owned houses under their nationwide contract covering foreclosure resales.

120.    Like First American, Fidelity affiliate Servicelink is doing the same sham title searches on homes whose mortgages are backed by Freddie Mac, Fannie Mae, FHA, or the VA that it performs for Freddie Mac-owned homes.  In the Denver area, for example, it has no means of performing a full search.  As mentioned above, ServiceLink is not a member of SKLD, the Denver area title plant; it nevertheless purports to conduct full title searches in connection with these homes.

121.    ServiceLink and First American Title Insurance Company are not the only entities performing shoddy title work in connection with mortgages guaranteed by Freddie Mac, Fannie Mae, the VA, and the FHA.  Todd found that other "national platform" title insurance companies are doing sham title commitments in foreclosure resales.  He first became aware of the scheme when an agent for SingleSource called the Denver office of Fidelity National Title Insurance Company and asked someone to do a "courtesy closing" for a property in the area.  SingleSource had no employees or agents in Denver at the time to do the closing.   Upon reviewing the documents, Todd realized that the title commitment contained only non-property specific exceptions.

122.    For example, on March 21, 2008, SingleSource, as agent for Ticor Title Company, issued a title commitment for a property located in Brighton, Colorado.  (Ex. 22, Property 12 SingleSource Title Commitment.)  Aurora Loan Services sold the property to Buyer 12, who borrowed $142,100.00 from Rocky Mountain Mortgage Specialists to make the purchase, and the FHA guaranteed the loan based, in part, on the title commitment.  (*Id.*) SingleSource's title commitment contains a mere five exceptions, none of which are property-specific, and all of which are "garbage." (*Id.*)  Todd compared SingleSource's title commitment

49

to a previous owner's policy issued by Security Title Guaranty Co., dated September 27, 2005, and discovered *nineteen* property-specific exceptions that SingleSource failed to include in its title commitment.  (Ex. 23, Property 12 Title Owner's Policy)  Among other exceptions, the SingleSource commitment failed to disclose "reservations by the Union Pacific Railway Company of (1) oil, coal and other minerals underlying the land, (2) the exclusive right to prospect for, mine and remove oil, coal and other minerals, and (3) the right of ingress and egress and regress to prospect for, mine and remove oil, coal and other minerals."  (*Id.*)  The SingleSource commitment also failed to mention an oil and gas lease, as well as "reservation of an undivided 49% interest in oil, gas and/or other minerals within a portion of said land." (*Id.*)

123.    In addition, All Real Estate Solutions, LLC, Accurate Title Group, LLC, Continental REO Services, Inc., Performance Title, Inc., and Telsi Real Estate Solutions, LLC are all licensed to conduct the business of title insurance in Colorado and do so in the Denver area.  None of these title insurance companies are members of SKLD, however, and therefore they lack the ability to perform complete title searches on properties in the metropolitan Denver area, including in connection with mortgages guaranteed by Freddie Mac, Fannie Mae, the VA, or the FHA.  Because these companies advertise that they are nationwide platforms with unified practices, procedures, and resources, their sham title searches are clearly not limited to the Denver area.

124.    Freddie Mac, Fannie Mae, the VA, and the FHA issued mortgage loan guarantees for these and other properties based on the assurances in Defendants' title commitments.  Freddie Mac, Fannie Mae, the VA, and the FHA would not have guaranteed these and other loans had they known that the title commitments were incomplete.

## IX.    ACTIONABLE CONDUCT

125.    This is an action to recover damages and civil penalties on behalf of the United States and Relator Todd arising from the false and/or fraudulent statements, claims, acts, and/or material omissions by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729-3732.

126.    Based on these provisions, Relator Todd, on behalf of the United States Government, seeks through this action to recover damages and civil penalties arising from Defendants' submission and/or causation of submission of false and/or fraudulent claims to the United States.  In this case, false and/or fraudulent claims were submitted to Freddie Mac for payment for title searches and other real estate services that were not provided, not correlative to the fee charged, or not permitted under state law.  False and/or fraudulent claims also were submitted to the United States in the form of applications for payment or approval and/or lenders' demands to pay under mortgage guarantees issued by Freddie Mac, Fannie Mae, the VA, and the FHA.  Defendants further (a) made, used, or caused to be made or used, false records and/or statements to conceal, avoid, or decrease an obligation to pay (or to reimburse) money to the Government; (b) made, used or caused to be made or used false records and/or statements material to an obligation to pay (or to reimburse) money to the Government; or (c) concealed or improperly avoided or decreased an obligation to pay (or to reimburse) money to the Government when they overcharged the Government for title services and other real estate services.  The United States has suffered significant damages as a result of false and/or fraudulent claims for payment for all such title services, other real estate services, and mortgage guarantees.

**A.     The False Claims Act**

127.     For conduct occurring before May 20, 2009, the False Claims Act ("FCA")

provides in pertinent part that:

Any person who

> (1)     knowingly presents, or causes to be presented, to an officer or
> employee of the United States Government or a member of the
> Armed Forces of the United States a false or fraudulent claim for
> payment or approval;
>
> (2)     knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or
> approved by the Government;
>
> ***
>
> (7)     knowingly makes, uses, or causes to be made or used, a false
> record or statement to conceal, avoid, or decrease an obligation to
> pay or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000

for each such claim, plus three times the amount of damages sustained by the Government

because of the false or fraudulent claim.  31 U.S.C. § 3729(a).  The FCA defined "claim" at that

time to include: "any request or demand, whether under a contract or otherwise, for money or

property which is made to a contractor, grantee, or other recipient if the United States

Government provides any portion of the money or property which is requested or demanded, or

if the Government will reimburse such contractor, grantee, or other recipient for any portion of

the money or property which is requested or demanded."  31 U.S.C 3729(c).

128.     For conduct occurring on or after May 20, 2009, the FCA provides that any

person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent
       claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false
       record or statement material to a false or fraudulent claim (except
       that this language applies to all claims pending on or after June 7,
       2008);

                                        ***

(G)    knowingly makes, uses, or causes to be made or used, a false
       record or statement material to an obligation to pay or transmit
       money or property to the Government or knowingly conceals or
       knowingly and improperly avoids or decreases an obligation to pay
       or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000

for each such claim, plus three times the amount of damages sustained by the Government

because of the false or fraudulent claim.  31 U.S.C. § 3729(a)(1).

129.    The amended FCA defines "claim" as:

any request or demand, whether under a contract or otherwise, for money or
property and whether or not the United States has title to the money or property,
that--

(i)     is presented to an officer, employee, or agent of the United States;
        or

(ii)    is made to a contractor, grantee, or other recipient, if the money or
        property is to be spent or used on the Government's behalf or to
        advance a Government program or interest, and if the United
        States Government--

        (I)    provides or has provided any portion of the money or
               property requested or demanded; or

        (II)   will reimburse such contractor, grantee, or other recipient
               for any portion of the money or property which is requested
               or demanded . . .

31 U.S.C. § 3729(b)(2).

53

130.    The FCA allows any persons having knowledge of a false and/or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

131.    There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator Todd is an original source as defined therein.  Relator Todd has direct and independent knowledge of the information on which the allegations are based.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator Todd has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relator Todd has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence, information, and documents related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the United States and the United States Attorney for the District of Colorado.  Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the United States and the United States Attorney for the District of Colorado.  This Complaint details Relator Todd's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

**B.** **The Fidelity Defendants and the First American Defendants Submitted False and/or Fraudulent Claims for Payments to Freddie Mac for Sham Title Work and Numerous Types of Improper Closing Fees Upon Resale of Freddie Mac-owned Foreclosed Homes**

    **i.** **Title Searches**

132.    As described more fully above, from at least 2006 to the present, the Fidelity

Defendants and the First American Defendants have submitted settlement statements[12] to

Freddie Mac that included charges for services that were not provided and were not correlative to

the fee charged, in violation of 31 U.S.C. § 3729(a).  Specifically, they have billed Freddie Mac

for what they claimed were exhaustive real estate title searches.  This should have included,

among other components, a title search by the property's legal description, which was not

performed.  The bills for such services were false and/or fraudulent because the fees did not

conform to the promised level of work.

133.    Freddie Mac entered into the contracts with these Defendants to perform a proper

title search and provide a listing of all liens and encumbrances on a property.  *See* Freddie Mac,

Freddie Mac's Single-Family Seller/Servicer Guidelines Ch.66.1 ("Freddie Mac requires the

Servicer to manage the foreclosure process to acquire clear and marketable title to the property in

a cost-effective, expeditious, and efficient manner.").  These Defendants, by providing the

"garbage searches" rather than the industry-standard, full title searches required by the contract

between them and Freddie Mac, made false representations and/or material omissions about the

quality of the property's title and about their own work.

---

[12] The HUD settlement statements included a list of charges collected by the title company on behalf of the Government.  (*See, e.g.,* Ex. 19, Property 9 Sellers Closing Statement.)  The title company collected the entire amount owed by the buyer, subtracted its fees, and passed along the balance to the seller, who, in these cases, was the Government.

134.    Given the role of Freddie Mac in the real estate market, the false statements, false representations, false records, and/or material omissions made by the Fidelity Defendants and the First American Defendants had the potential to influence Freddie Mac's payment decision. Because these Defendants did not conduct full and complete title searches, as described above, certain covenants, conditions, restrictions, and easements were not disclosed.  As a result, the title commitments were not in conformity with the terms of the contracts between Freddie Mac and these Defendants.  Performance of the contractually-required full title search, and/or the subsequent disclosure to Freddie Mac of all covenants, conditions, restrictions, and easements, was material to Freddie Mac's decision to pay the Fidelity Defendants and the First American Defendants for the title searches.  Had Freddie Mac known that the full title search was not performed, and/or that all covenants, conditions, restrictions, and easements were not disclosed, it would not have paid the Fidelity Defendants and the First American Defendants for the title searches.  The title work that was performed was so insufficient as to be worthless to Freddie Mac.

135.    The losses suffered by Freddie Mac were costs borne not just by Freddie Mac, but also by the FHFA, as Freddie Mac's conservator.  Since 2008, the FHFA has controlled and directed Freddie Mac's assets and operations.  The United States Treasury has purchased billions of dollars worth of Freddie Mac's stock.  Since 2009, the Congressional Budget Office has reported Freddie Mac's operating costs as part of its federal spending projections.  Moreover, the monies spent by Freddie Mac in its contract with these Defendants are spent on the Government's behalf to advance the Government interest in stabilizing the secondary mortgage market in order to increase home ownership.

56

136.    Because of the illegal acts described above, the Fidelity Defendants and the First American Defendants made hundreds of millions of dollars in payment for title services that were not performed as described and were worthless.  The ultimate submission to Freddie Mac of false and/or fraudulent claims for payment was a foreseeable factor in the Government's loss, and a consequence of the scheme.  Consequently, the States and the United States Government have suffered substantial damages.

**ii.      Closing Fees**

137.    As described more fully above, from at least 2006 to the present, the Fidelity Defendants and the First American Defendants have submitted settlement statements to Freddie Mac that included charges for services that were not provided and were not correlative to the fee charged, in violation of 31 U.S.C. § 3729(a).  Specifically, they have billed Freddie Mac for closing fees in amounts beyond those permissible under state laws.  These Defendants have also charged for fees for which no corresponding service was performed at all, such as document preparation fees, notary fees, loan closing fees, document processing and delivery fees, and others.  Some of these fees were charged in violation of these Defendants' contracts with Freddie Mac.  The bills for such services were false and/or fraudulent because the fees were in violation of the rates permitted under law and/or these Defendants' contracts with Freddie Mac and/or were unnecessary services for which no work was required or performed.

138.    Given the role of Freddie Mac in the real estate market, the false statements, false representations, false records, and/or material omissions made by the Fidelity Defendants and the First American Defendants had the potential to influence Freddie Mac's payment decision. Actual provision of services and conformity to state law of the fees charged by these Defendants

was material to Freddie Mac's decision to pay these Defendants for the services.  Had Freddie Mac known that the services included on these Defendants' settlement statements were not provided or that the fees charged were in amounts beyond those permitted under state law, it would not have paid these Defendants for those services.

139.    The losses suffered by Freddie Mac were costs borne not just by Freddie Mac, but also by the FHFA, as Freddie Mac's conservator.  Since 2008, the FHFA has controlled and directed Freddie Mac's assets and operations.  The United States Treasury has purchased billions of dollars worth of Freddie Mac's stock.  Since 2009, the Congressional Budget Office has reported Freddie Mac's operating costs as part of its federal spending projections.  Moreover, the monies spent by Freddie Mac in its contract with the Fidelity Defendants and the First American Defendants are spent on the Government's behalf to advance the Government interest in stabilizing the secondary mortgage market in order to increase home ownership.

140.    Because of the illegal acts described above, the Fidelity Defendants and the First American Defendants made hundreds of millions of dollars in payment for closing fees and services that were either beyond the rate permitted by law or were not necessary and never provided.  The ultimate submission to Freddie Mac of false and/or fraudulent claims for payment was a foreseeable factor in the Government's loss, and a consequence of the scheme. Consequently, the States and the United States Government have suffered substantial damages.

**C.    Defendants Caused Sellers of Government-Guaranteed Properties to Present False and/or Fraudulent Claims to the Government**

141.    As described more fully above, from at least 2006 to the present, all named Defendants have presented settlement statements to buyers and sellers of properties whose mortgages are guaranteed by the Government—through Freddie Mac, Fannie Mae, the VA, or

the FHA—that included charges for services that were not provided and were not correlative to the fee charged. Defendants have billed buyers and/or sellers of properties guaranteed by the Government for what they claimed were exhaustive real estate title searches. The title work actually performed lacked, among other components, a search by the property's legal description and was consequently worthless. The settlement statements and other statements describing title work to be performed or already performed were thus false and/or fraudulent. Defendants' false title searches caused sellers to present false and/or fraudulent claims to the Government—in the form of applications for payment or approval of a default insurance policy to benefit the mortgage lender and guarantee the mortgage—in violation of 31 U.S.C. § 3729(a).

142.    Based on these title searches, Freddie Mac, Fannie Mae, the VA, and the FHA approved mortgage guarantee applications and issued policies under which they guaranteed hundreds of thousands of loans they would not otherwise have guaranteed. Further, based on these title searches, mortgage lenders have called in mortgages and have made false and/or fraudulent demands for payment on policies that never should have been issued. Provision of a clean and marketable title, free of all liens and encumbrances other than those disclosed and agreed to by the buyer, was material to these entities' loan guarantee decision. *See* Freddie Mac, Freddie Mac's Single-Family Seller/Servicer Guidelines Ch.66.1 ("Freddie Mac requires the Servicer to manage the foreclosure process to acquire clear and marketable title to the property in a cost-effective, expeditious, and efficient manner."). When the borrowers went into default, the sellers foreclosed upon the loans, calling in the Government entity's guarantee.

143.    Given the role of Freddie Mac, Fannie Mae, the VA, and the FHA in the real estate market, given Defendants' false statements and representations, and given the false records

that Defendants made, used, or caused to be made or used, Defendants' conduct had the potential

to influence the Government's mortgage guarantee decision.  Performance of a full title search,

and/or the subsequent disclosure of all covenants, conditions, restrictions, and easements, was

material to Freddie Mac's, Fannie Mae's, the VA's, and the FHA's decision to guarantee the

mortgages.  Had Freddie Mac, Fannie Mae, the VA, or the FHA known that all covenants,

conditions, restrictions, and easements were not disclosed, it would not have offered a mortgage

guarantee.

144.    The losses suffered by Freddie Mac and Fannie Mae were costs borne not just by

Freddie Mac and Fannie Mae, but also by the FHFA, as Freddie Mac's and Fannie Mae's

conservator.  Since 2008, the FHFA has controlled and directed Freddie Mac's and Fannie Mae's

assets and operations.  The United States Treasury has purchased billions of dollars worth of

Freddie Mac's and Fannie Mae's stock.  Since 2009, the Congressional Budget Office has

reported Freddie Mac's and Fannie Mae's operating costs as part of its federal spending

projections.  Moreover, the monies spent by Freddie Mac and Fannie Mae for loan guarantees

are spent on the Government's behalf to advance the Government interest in stabilizing the

secondary mortgage market in order to increase home ownership.

145.    Because of the illegal acts described above, Freddie Mac, Fannie Mae, the VA,

and the FHA have paid hundreds of millions of dollars in payment for mortgage guarantees that

it otherwise would never have issued.  The ultimate submission to Freddie Mac, Fannie Mae, the

VA, and the FHA of false and/or fraudulent claims for payment was a foreseeable factor in the

Government's loss, and a consequence of the scheme.  Consequently, the States and the United

States Government have suffered substantial damages.

**D.** **Defendants Made, Used, or Caused to Be Made or Used False Records and/or Statements to Receive Payment from the Government for Sham Title Work, Numerous Other Types of Improper Closing Fees, and Mortgage Guarantees**

    **i.** **Title Searches**

        **(a)** **Freddie Mac-Owned Properties**

146.    The Fidelity Defendants and the First American Defendants knowingly made or used, or caused to be made or used, false records or statements, or omitted material facts (a) to get false or fraudulent claims paid or approved by the Government, or (b) that were material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a).  The false records or statements included, but were not limited to, the false or misleading title commitments prepared by these Defendants and their agents, invoices for title searches performed, settlement statements, and other records and/or statements provided to Freddie Mac in connection with properties it owned.

147.    Freddie Mac entered into the contracts with the Fidelity Defendants and the First American Defendants to provide title searches.  The contracts included language expressly detailing the nature and quality of the title searches to be performed by these Defendants.  Their final product, and the basis of Freddie Mac's payment, was to provide a listing of all liens and encumbrances on a property.  *See* Freddie Mac, Freddie Mac's Single-Family Seller/Servicer Guidelines Ch.66.1 ("Freddie Mac requires the Servicer to manage the foreclosure process to acquire clear and marketable title to the property in a cost-effective, expeditious, and efficient manner.").  By providing only the results of its "garbage searches" in place of an industry-standard, full title search, these Defendants falsely certified, expressly and/or impliedly, that there were no further liens or encumbrances on the property.

61

148.     When submitting claims for payment under the contracts, the Fidelity Defendants
and the First American Defendants made express and/or implied certifications that they were in
conformity with the terms set out in the contracts between them and Freddie Mac, including
demonstrating that property's title is free from all encumbrances and liens.   Because these
Defendants did not conduct full and complete title searches, as described above, certain
covenants, conditions, restrictions, and easements were not disclosed.   As a result, the title
commitments were not in conformity with the terms of the contracts between them and Freddie
Mac.

149.     Compliance with the contracts was material to Freddie Mac's payment decisions.
Each false certification or representation made in connection with a claim for payment for
services that was not in conformity with the terms of the contract represents a false and/or
fraudulent record or statement.   Each claim for payment for such services submitted to Freddie
Mac represents a false and/or fraudulent claim for payment.

150.     Given the role of Freddie Mac in the real estate market, given the Fidelity
Defendants' and the First American Defendants' false statements and representations, and given
the false records that these Defendants made, used, or caused to be made or used, these
Defendants' conduct had the potential to influence Freddie Mac's payment decision.
Performance of the contractually-required full title search, and/or the subsequent disclosure to
Freddie Mac of all covenants, conditions, restrictions, and easements, was material to Freddie
Mac's decision to pay the Fidelity Defendants and the First American Defendants for the title
searches.   Had Freddie Mac known that all covenants, conditions, restrictions, and easements

were not disclosed, it would not have paid the Fidelity Defendants and the First American Defendants for the title searches.

151.    The losses suffered by Freddie Mac were costs borne not just by Freddie Mac, but also by the FHFA, as Freddie Mac's conservator.  Since 2008, the FHFA has controlled and directed Freddie Mac's assets and operations.  The United States Treasury has purchased billions of dollars worth of Freddie Mac's stock.  Since 2009, the Congressional Budget Office has reported Freddie Mac's operating costs as part of its federal spending projections.  Moreover, the monies spent by Freddie Mac in its contract with the Fidelity Defendants and the First American Defendants are spent on the Government's behalf to advance the Government interest in stabilizing the secondary mortgage market in order to increase home ownership.

152.    Because of the illegal acts described above, the Fidelity Defendants and the First American Defendants made hundreds of millions of dollars in payment for title services that were not delivered.  The ultimate submission to Freddie Mac of false and/or fraudulent claims for payment was a foreseeable factor in the Government's loss, and a consequence of the scheme.  Consequently, the States and the United States Government have suffered substantial damages.

**(b)    Properties Guaranteed by the Government**

153.    The Defendants knowingly made or used, or caused to be made or used, false records or statements, or omitted material facts (a) to get false or fraudulent claims paid or approved by the Government, or (b) that were material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a).  The false records or statements included, but were not limited to, the false or misleading title commitments prepared by Defendants and their agents, invoices for title

searches performed, settlement statements, and other records and/or statements provided to buyers and/or sellers in connection with properties guaranteed by Freddie Mac, Fannie Mae, the VA, or the FHA. Defendants made or used, or caused to be made or used the false records or statements in requesting approval of mortgage loan guarantee applications by Freddie Mac, Fannie Mae, the VA, or the FHA.

154. Defendants charged buyers and/or sellers of properties guaranteed by Freddie Mac, Fannie Mae, the VA, or the FHA for title searches. Settlement statements and/or the agreements with these buyers and/or sellers included language expressly detailing the nature and quality of the title searches to be provided by Defendants. Defendants' final product, and the basis of the buyers' and/or sellers' payment, was to provide a listing of all liens and encumbrances on a property. Because Defendants did not conduct full and complete title searches, as described above, certain liens, encumbrances, covenants, conditions, restrictions, and easements were not disclosed.

155. Provision of a clean and marketable title, free of all liens and encumbrances other than those disclosed and agreed to by the buyer, was material to the Government's loan guarantee decision. Each false certification or representation made in connection with an application for a loan guarantee represents a false or fraudulent record or statement. Each request for payment under the loan guarantee issued by Freddie Mac, Fannie Mae, the VA, or the FHA represents a false and/or fraudulent claim for payment.

156. Given the role of Freddie Mac, Fannie Mae, the VA, and the FHA in the real estate market, given Defendants' false statements and representations, and given the false records that Defendants made, used, or caused to be made or used, Defendants' conduct had the potential

64

to influence the Government's mortgage guarantee decision.  Performance of a full title search, and/or the subsequent disclosure of all covenants, conditions, restrictions, and easements was material to Freddie Mac's, Fannie Mae's, the VA's, and the FHA's decision to guarantee the mortgages.  Had Freddie Mac, Fannie Mae, the VA, or the FHA known that all covenants, conditions, restrictions, and easements were not disclosed, it would not have offered a mortgage guarantee.

157.    The losses suffered by Freddie Mac and Fannie Mae were costs borne not just by Freddie Mac and Fannie Mae, but also by the FHFA, as Freddie Mac's and Fannie Mae's conservator.  Since 2008, the FHFA has controlled and directed Freddie Mac's and Fannie Mae's assets and operations.  The United States Treasury has purchased billions of dollars worth of Freddie Mac's and Fannie Mae's stock.  Since 2009, the Congressional Budget Office has reported Freddie Mac's and Fannie Mae's operating costs as part of its federal spending projections.  Moreover, the monies spent by Freddie Mac and Fannie Mae for loan guarantees are spent on the Government's behalf to advance the Government interest in stabilizing the secondary mortgage market in order to increase home ownership.

158.    Because of the illegal acts described above, Freddie Mac, Fannie Mae, the VA, and the FHA have paid hundreds of millions of dollars in payment for mortgage guarantees that it otherwise would never have issued.  The ultimate submission to Freddie Mac of false and/or fraudulent claims for payment was a foreseeable factor in the Government's loss, and a consequence of the scheme.  Consequently, the States and the United States Government have suffered substantial damages.

ii.     **Closing Fees**

159.    The Fidelity Defendants and the First American Defendants knowingly made or used, or caused to be made or used, false records or statements, or omitted material facts (a) to get false or fraudulent claims paid or approved by the Government, or (b) that were material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a).  The false records or statements included, but were not limited to, the false or misleading fees, invoices for work performed, settlement statements, and other statements provided to Freddie Mac, and the false certifications, express and/or implied, and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting.

160.    When submitting claims for payment, the Fidelity Defendants and the First American Defendants made express and/or implied certifications that they were in conformity with the terms set out on the contracts between them and Freddie Mac.  In particular, Freddie Mac did not permit any additional closing fees on top of the $595 closing fee and $150 signing fee.  Nonetheless, these Defendants charged the Government an unauthorized $150 document processing and delivery fee.  These Defendants also charged a $60 fee for notary services for which no corresponding services were provided.

161.    Moreover, the Fidelity Defendants and the First American Defendants charged higher real estate fees than were permitted under state law.  In 2009, for example, the Fidelity Defendants set the real estate closing fee at $240 by filing a notice with the State of Colorado, yet charged Freddie Mac a $745 real estate closing fee per transaction. In 2010, the Fidelity Defendants set the real estate closing fee at $250, but charged Freddie Mac a $745 real estate closing fee per transaction.   For years, the Fidelity Defendants and the First American

66

Defendants have been charging fees and submitting invoices that are not in conformity with the terms of the contracts between them and Freddie Mac.

162.    Compliance with federal and state laws and regulations was a condition of payment under the contract.  The Fidelity Defendants' and the First American Defendants' contracts with Freddie Mac, as outlined in the Provider Agreements and the Servicer Guidelines, required them to comply with all "federal, State and local laws, ordinances, regulations and orders."  In particular, these Defendants knowingly charged Freddie Mac more than was permitted under state law for real estate closing fees.  These Defendants also knowingly charged Freddie Mac the same loan closing fee whether the transaction involved a loan or not, in violation of RESPA.  *See* 12 U.S.C. § 2607(b); 24 C.F.R. § 3500.14.  In 2008, ServiceLink and Fidelity National Title Insurance Company agreed to share a percentage of the title premiums. This constitutes a kickback in violation of RESPA.  *Id.*  In 2010, the Fidelity Defendants knowingly included Freddie Mac's loan closing fee as part of its real estate fee, in violation of RESPA.  *Id.*  Each false certification or representation made in connection with a claim for payment for services that were not in conformity with federal law or in violation of state laws limiting closing fees represent a false or fraudulent record or statement.  Each claim for payment for such services submitted to the Government represents a false and/or fraudulent claim for payment.

163.    Given the role of Freddie Mac in the real estate market, given the Fidelity Defendants' and the First American Defendants' false statements and representations, and given the false records that these Defendants made, used, or caused to be made or used, the Fidelity Defendants' and the First American Defendants' conduct had the potential to influence Freddie

67

Mac's payment decision.  Actual provision of services and conformity to state law of the fees charged by these Defendants was material to Freddie Mac's decision to pay these Defendants for the services.  Had Freddie Mac known that the services included on these Defendants' settlement statements were not provided or that the fees charged were in amounts beyond those permitted under state law, it would not have paid these Defendants for those services.

164.    The losses suffered by Freddie Mac were costs borne not just by Freddie Mac, but also by the FHFA, as Freddie Mac's conservator.  Since 2008, the FHFA has controlled and directed Freddie Mac's assets and operations.  The United States Treasury has purchased billions of dollars worth of Freddie Mac's stock.  Since 2009, the Congressional Budget Office has reported Freddie Mac's operating costs as part of its federal spending projections.  Moreover, the monies spent by Freddie Mac in its contract with the Fidelity Defendants and the First American Defendants are spent on the Government's behalf to advance the Government interest in stabilizing the secondary mortgage market in order to increase home ownership.

165.    Because of the illegal acts described above, the Fidelity Defendants and the First American Defendants made hundreds of millions of dollars in payment for real estate services that were not fully performed.  The ultimate submission to Freddie Mac of false and/or fraudulent claims for payment was a foreseeable factor in the Government's loss, and a consequence of the scheme.  Consequently, the States and the United States Government have suffered substantial damages.

E.   **Defendants Failed to Disclose Its Obligation to Repay Freddie Mac and the
Government in Violation of the Reverse False Claims Provision**

i.   **Title Searches**

166.   In further consequence of the Fidelity Defendants' and the First American

Defendants' fraudulent scheme in connection with the overcharging for title searches discussed

above, these Defendants knowingly (a) made, used, or caused to be made or used, false records

and/or statements to conceal, avoid, or decrease an obligation to pay (or to reimburse) money to

the Government; (b) made, used or caused to be made or used false records and/or statements

material to an obligation to pay (or to reimburse) money to the Government; or (c) concealed or

improperly avoided or decreased an obligation to pay (or to reimburse) money to the

Government..   These false statements and/or records include but are not limited to false

certifications or representations made or caused to be made by the Fidelity Defendants and the

First American Defendants in obtaining the contract award and/or in obtaining payment thereon,

the fraudulently incomplete and deficient "owner's policies" that contained only basic

grantor/grantee searches, and settlement statements.   These Defendants knowingly made, used,

or caused to be made or used false records and/or statements to conceal their obligation to

reimburse money to the Government and its agents and instrumentalities when they provided

the allegedly exhaustive title searches to Freddie Mac, knowing that they were not what was

contracted for.

167.   By virtue of the false records and/or statements that the Fidelity Defendants and

the First American Defendants made, used, or caused to be made or used or material omissions

by these Defendants, the United States has suffered substantial monetary damages.

69

ii.    **Closing Fees**

(a)    **RESPA as to the Buyer**

168.    The provisions of RESPA apply to any federally-related mortgage loan, which includes any loan owned by Freddie Mac.  HUD is authorized to enforce these provisions through fines and injunctions.  Through the Fidelity Defendants' and the First American Defendants' fraudulent scheme in connection with the overcharging the buyer for closing fees and worthless or nonexistent services, such as document preparation and notary fees, these Defendants knowingly (a) made, used, or caused to be made or used, false records and/or statements to conceal, avoid, or decrease an obligation to pay (or to reimburse) money to the Government; (b) made, used or caused to be made or used false records and/or statements material to an obligation to pay (or to reimburse) money to the Government; or (c) concealed or improperly avoided or decreased an obligation to pay (or to reimburse) money to the Government..  These false statements and/or records include but are not limited to false certifications or representations made or caused to be made by the Fidelity Defendants and the First American Defendants in obtaining the contract award and/or in obtaining payment thereon and the settlement statements that included fee listings.  These Defendants knowingly made, used, or caused to be made or used false records and/or statements to conceal their obligation to reimburse money to the Government and its agents and instrumentalities when they provided settlement statements with fraudulent fee listings in violation of RESPA.

169.    By virtue of the false records and/or statements that the Fidelity Defendants and the First American Defendants made, used, or caused to be made or used or material omissions by these Defendants, the United States Government has suffered substantial monetary damages.

**(b)    RESPA as to Freddie Mac**

170.    The provisions of RESPA apply to any federally-related mortgage loan, which includes any loan owned by Freddie Mac.  HUD has the authority to enforce these provisions through fines and injunctions.  Through The Fidelity Defendants' and the First American Defendants' fraudulent scheme in connection with the overcharging of Freddie Mac for closing fees and worthless services, such as document and notary fees, these Defendants knowingly (a) made, used, or caused to be made or used, false records and/or statements to conceal, avoid, or decrease an obligation to pay (or to reimburse) money to the Government; (b) made, used or caused to be made or used false records and/or statements material to an obligation to pay (or to reimburse) money to the Government; or (c) concealed or improperly avoided or decreased an obligation to pay (or to reimburse) money to the Government..  These false statements and/or records include but are not limited to fee listings and false certifications or representations made or caused to be made by the Fidelity Defendants and the First American Defendants in obtaining the contract award and/or in obtaining payment thereon and the settlement statements that included fee listings.  These Defendants knowingly made, used, or caused to be made or used false records and/or statements to conceal their obligation to reimburse money to the Government and its agents and instrumentalities when they provided settlement statements with fraudulent fee listings in violation of RESPA.

171.    By virtue of the false records and/or statements that the Fidelity Defendants and the First American Defendants made, used, or caused to be made or used or material omissions by Defendants, the United States Government has suffered substantial monetary damages.

71

**F.**     **Fidelity National Title Insurance Company Retaliated Against Todd in Violation of the FCA**

172.    Fidelity National Title Insurance Company took negative employment actions against Todd in response to his investigation of the allegations in this pre-filing disclosure statement.   Before revealing this fraud to John Longo, President of Fidelity National Title Insurance Company, and Lambos Gianos, Executive Vice President, Todd served as Vice President of the residential division in Colorado.   He was earning over $200,000 a year from his base salary and commissions, not including his car allowance.   The same month Todd revealed the fraud outlined above to Longo and Gianos, they demoted Todd from Vice President to account manager, decreased his salary from $4,500 per month to $4,000 per month, cut his commissions in half, and lowered his car allowance by $100 per month.   Two months later, they further reduced his salary to $3,000 per month.   A year later, still concerned about the ServiceLink's fraudulent conduct, Todd repeated his concerns to Longo.   Longo never took any corrective steps.   Months later, Longo told Todd he was taking away his $3,000 per month salary and car allowance.   Instead, Todd would be commission only.   Longo also informed Todd he could no longer work on the ServiceLink account, which was the primary source of Todd's commissions.   As a result, Todd's commission and revenue decreased by about 90%.   Because of Fidelity National Title Insurance Company's conduct, Todd suffered negative employment consequences and has suffered damages.

## X.     CAUSES OF ACTION

**A.**     **Count I – False Claims (31 U.S.C. § 3729(a)(1) (former); 31 U.S.C. § 3729(a)(1)(A) (current))**

173.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

174.     As a result of Defendants' scheme to bill the Government for incomplete title searches and for other services that were not provided, not correlative to the fee charged, or not permitted under state law, all of the claims that Defendants presented and/or caused to be presented to the Government are false and/or fraudulent.  Moreover, as a result of Defendants' scheme to bill buyers and/or sellers of properties guaranteed by Freddie Mac, Fannie Mae, the VA, or the FHA for incomplete title searches, all of the claims that Defendants presented and/or caused to be presented to the Government are false and/or fraudulent.  Defendants knowingly presented or caused to be presented such false and/or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1) and/or 31 U.S.C. § 3729(a)(1)(A).

175.     The United States paid the false and/or fraudulent claims.

176.     By virtue of the false and/or fraudulent claims that Defendants knowingly presented or caused to be presented, the United States has suffered substantial monetary damages.

B.     Count II – False Records or Statements (31 U.S.C. § 3729(a)(2) (former); 31 U.S.C. § 3729(a)(1)(B) (current))

177.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

178.     As a result of Defendants' scheme to bill the Government for incomplete title searches and for other services that were not provided, not correlative to the fee charged, or not permitted under state law, Defendants knowingly made or used or caused to be made or used false records or statements or omitted material facts (a) to get false and/or fraudulent claims paid

73

or approved by the Government, and/or (b) that were material to false and/or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2) and/or 31 U.S.C. § 3729(a)(1)(B). These false statements or records included, but were not limited to, false or misleading title commitments prepared by Defendants and their agents, invoices, settlement statements, and other records and/or statements provided to Freddie Mac and the false certifications, express and/or implied, and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting. Each invoice and/or claim for reimbursement for incomplete titles searches or other services that were not provided, not correlative to the fee charged, or not permitted under state law represents a false and/or fraudulent claim for payment.

179.    As a result of Defendants' scheme to bill buyers and/or sellers of properties guaranteed by the Government for incomplete title searches, Defendants knowingly made or used or caused to be made or used false records or statements or omitted material facts (a) to get false and/or fraudulent claims paid or approved by the Government, and/or (b) that were material to false and/or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2) and/or 31 U.S.C. § 3729(a)(1)(B). These false statements or records included, but were not limited to, false or misleading title commitments prepared by Defendants and their agents, invoices, settlement statements, and other records and/or statements provided to buyers and/or sellers in connection with properties guaranteed by Freddie Mac, Fannie Mae, the VA, or the FHA. Each invoice and/or claim for reimbursement for incomplete titles searches represents a false and/or fraudulent claim for payment.

180.    By virtue of the false records or statements that Defendants made or used or caused to be made or used, the United States has suffered substantial monetary damages.

**C.    Count III – Reverse False Claims (31 U.S.C. § 3729(a)(7) (former); 31 U.S.C. 3729(a)(1)(G) (current))**

181.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

182.    For the duration of Defendants' scheme to bill the Government for incomplete title searches for other services that were not provided, not correlative to the fee charged, or not permitted under state law, Defendants have refused to reimburse the Government, which was overcharged for title searches and other services.  Throughout this scheme, Defendants have knowingly (a) made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay money to the Government, (b) made, used or caused to be made or used false records and/or statements material to an obligation to pay (or to reimburse) money to the Government; or (c) concealed or improperly avoided or decreased an obligation to pay (or to reimburse) money to the Government., in violation of 31 U.S.C. § 3729(a)(7) and/or 31 U.S.C. 3729(a)(1)(G).  These false statements or records include, but are not limited to, false or misleading title commitments prepared by Defendants and their agents, invoices, settlement statements, and other records and/or statements provided to Freddie Mac and the false certifications, express and/or implied, and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting.

183.    By virtue of Defendants' failure to disclose their obligation to repay the Government in violation of 31 U.S.C. §3729(a)(7) and/or 31 U.S.C. 3729(a)(1)(G), the Government has suffered substantial monetary damages.

**D.    Count IV – Retaliation (31 U.S.C. § 3730(h))**

184.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

185.    In violation of 31 U.S.C. § 3730(h), the Fidelity Defendants took negative employment actions against Relator in response to his investigation and initiation of this claim.

186.    As a result of the Fidelity Defendants' conduct, Relator suffered negative employment consequences and has suffered damages, now and in the future.

**RELIEF**

187.    On behalf of the United States Government, the *qui tam* Relator seeks to receive monetary damages equal to three times that suffered by the United States Government.    In addition, Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

188.    The *qui tam* Relator seeks to receive on his own behalf all monetary damages that he is entitled to for Defendants' retaliatory conduct against him.    In addition, Relator seeks punitive damages on his own behalf.

189.    The *qui tam* Relator seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

190.    The *qui tam* Relator seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

191.    The *qui tam* Relator seeks pre-judgment interest at the highest rate allowed by law.

## PRAYER

WHEREFORE, Relator prays that this Court enter judgment on behalf of the Relator and

against Defendants for the following:

a. Damages in the amount of three (3) times the actual damages suffered by the United
   States Government as a result of Defendants' conduct;

b. Civil penalties against Defendants equal to $11,000 for each violation of 31 U.S.C. §
   3729;

c. The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d. All costs and expenses of this litigation, including attorneys' fees and costs of court;

e. Relator's individual damages;

f. Punitive damages to Relator for the retaliatory conduct by Defendants;

g. Pre-judgment interest at the highest rate allowed by law; and

h. All other relief on behalf of Relator or the United States Government to which they
   may be entitled and that the Court deems just and proper.

## XI.    JURY DEMAND

192.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Respectfully submitted,


_____

Joel M. Androphy
State Bar No. 01254700
Sarah M. Frazier
State Bar No. 24027320
Kathryn E. Nelson
State Bar No. 24037166
Rachel L. Grier
State Bar No. 24055592
Berg & Androphy
3704 Travis Street

77

Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785
jandrophy@bafirm.com

Attorneys-in-Charge for
Relator Dale Todd

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was forwarded via the United States Mail, certified, return receipt requested, by facsimile, by electronic mail, or by messenger to the United States Attorney's Office in the District of Colorado and the Department of Justice on March 15, 2012.

_____
Joel M. Androphy

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO. |
| *ex rel.* Dale Todd, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | |
| | § | |
| FIDELITY NATIONAL FINANCIAL, INC., et al. | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

**INDEX TO EXHIBITS TO RELATOR'S ORIGINAL COMPLAINT**

| Ex # | Description |
|:---:|---|
| 1 | Property 1 Service Link Title Commitment |
| 2 | Property 1 Fidelity Title Commitment |
| 3 | Analysis of Title Agencies |
| 4 | Email from Todd to Dubois |
| 5 | Property 2 Service Link Title Commitment |
| 6 | Property 2 Fidelity Title Commitment |
| 7 | Property 3 Service Link Title Commitment |
| 8 | Property 3 Fidelity Title Commitment |
| 9 | Property 4 Service Link Title Commitment |
| 10 | Property 4 Fidelity Title Commitment |
| 11 | Property 5 Service Link Title Commitment |
| 12 | Email from Todd to Perez |
| 13 | Property 5 Demand for Possession |
| 14 | Email from Longo to Todd |
| 15 | Email from Huxoll to Todd |
| 16 | Property 6 Lane Invoice |
| 17 | Property 7 Sellers Closing Statement |
| 18 | Property 8 Sellers Closing  Statement |
| 19 | Property 9 Sellers Closing Statement |
| 20 | Property 10 Sellers Closing Statement |
| 21 | Property 11 Sellers Closing Statement |
| 22 | Property 12 Single Source Title Commitment |

| 23 | Property 12 Title Owner's Policy |
|----|-------------------------------------------|
| 24 | Property 13 First American Title Commitment |
| 25 | Property 13 Deed of Trust |
| 26 | Property 13 Warranty Deed |
| 27 | Kensington CCR's |