IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-00666-REB-CBS

DALE TODD,

        Plaintiff,

v.

FIDELITY NATIONAL FINANCIAL, INC.,
FIDELITY NATIONAL TITLE INSURANCE COMPANY,
CHICAGO TITLE INSURANCE COMPANY,
SERVICELINK, INC., and
SERVICELINK, LLC,

        Defendants.

---

## RECOMMENDATION REGARDING DEFENDANTS' MOTION TO DISMISS

---

Magistrate Judge Shaffer

This matter comes before the court on Defendants Fidelity National Financial, Inc., Fidelity National Title Insurance Company, Chicago Title Insurance Company, Service Link, Inc., and Service Link, LLC's (collectively "Defendants") Motion to Dismiss Plaintiff's Second Amended Complaint (doc. #121), filed on October 11, 2013. This motion was referred to the Magistrate Judge pursuant to the Order of Reference dated October 11, 2013 (doc. #122). This court has carefully considered the motion and related briefing, the entire case file, the comments offered by the parties during the June 25, 2013 and July 31, 2013 Scheduling Conferences, the September 6, 2013 Telephonic Discovery Hearing, and the January 27, 2014 Motion Hearing, and applicable case law. For the following reasons, I recommend that the Motion to Dismiss be granted in part and denied in part.

## PROCEDURAL BACKGROUND

On March 15, 2012, Plaintiff Dale Todd filed a lawsuit under seal on behalf of the United States and against twenty-two entities[1] claiming four violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732, premised on allegations that Defendants charged the Federal Home Loan Mortgage Corporation ("Freddie Mac") for title searches that failed to satisfy the parties' contracts, applicable law, and industry standards.  Plaintiff alleges Defendants violated the FCA when they (1) knowingly presented or caused to be presented false and/or fraudulent claims for payment or approval; (2) knowingly made or used or caused to be made or used false records or statements or omitted material facts (a) to get false and/or fraudulent claims paid or approved, and/or (b) that were material to false and/or fraudulent claims; and (3) refused to reimburse overcharges for title searches.   31 U.S.C. §§ 3729(a)(1),(2) & (7) (2006); 31 U.S.C. §§ 3729(a)(1)(A), (B) & (G) (2009).   Finally, Plaintiff alleges that Defendants Fidelity National Title Insurance Company and Fidelity National Financial Company retaliated against Plaintiff in violation of 31 U.S.C. § 3730(h).

On November 21, 2012, the United States filed a notice of its election to decline intervention and a Motion to Unseal the Case.   (Doc. #9 and #10).   Plaintiff filed a First Amended Complaint ("FAC") on January 15, 2013 that added seven defendants (doc. #11), and filed a Motion to Unrestrict the case on March 14, 2013.   (Doc. #13).   This court granted the United States' Motion to Unseal Case File on March 15, 2013 and declared Plaintiff's Motion to

---

[1] Accurate Title Group, LLC, Alamo Title Insurance, All Real Estate Solutions, LLC, Censtar Title Insurance Company, Chicago Title and Trust Company, Commonwealth Lawyers Title Agency Holding, LLC, Commonwealth Land Title Insurance Company, Continental Reo Services, Inc., FTNG Holdings, Inc., FTNS Holdings, Inc., Fidelity National Financial, Inc., Fidelity National Title Group, Inc., Fidelity National Title Insurance Company, First American Financial Corporation, First American Title Insurance Company, Lawyers Title Company, LLC, Performance Title, Inc., Security Title Guaranty Co., Servicelink, Inc., Singlesource Property Solutions, LLC, Telsi Real Estate Solutions, LLC, Ticor Title Company.

Unrestrict moot.  (Doc. #15).  On April 29, 2013, the Fidelity Defendants[2] requested an unopposed extension of time until June 10, 2013 to file an answer or otherwise respond.  (Doc. #27).  This court granted the request on April 30, 2013 (doc. #29).  Plaintiff thereafter stipulated that Defendants Castle Stawiarski, LLC and CS Legal Services (collectively "the CS Defendants") would file a responsive pleading by June 17, 2013 (doc. #38) and Defendants Colorado American Title, LLC and Next Organization, LLC would also file a responsive pleading on June 17, 2013 (doc. #39).  On May 2, 2013, Plaintiff filed a notice of voluntary dismissal as to Defendants Freeport Financial Partners, LLC and Stark Investments, LP (doc. #30); District Judge Blackburn entered an order dismissing them the same day.  (Doc. #31).  On June 7, 2013, Plaintiff filed an unopposed motion to substitute Service Link, LLC for Service Link Title Company (doc. #43), which this court granted on June 10, 2013 (doc. #45).  Plaintiff filed a notice of voluntary dismissal as to Defendant Censar Title Insurance Co. on June 12, 2013 (doc. #53), and Judge Blackburn ordered its dismissal the next day (doc. #54).

On June 10, 2013 the following Defendants filed motions to dismiss the FAC: First American Title Insurance Company (doc. #46); First American Financial Corporation (doc. #48); and the Fidelity Defendants (doc. #49).  On June 17, 2013 the following Defendants filed motions to dismiss the FAC: Colorado American Title, LLC (doc. #55); Next Organization, LLC (doc. #56); and the CS Defendants (doc. 57).  Plaintiff filed a notice of voluntary dismissal as to Defendant CMS Holdings, LLC on June 18, 2013 (doc. #60), and Judge Blackburn dismissed it from the case the same day (doc. #66).  Plaintiff filed a stipulated Motion for Protective Order on

[2] At that time, the Fidelity Defendants consisted of Fidelity National Financial, Inc., FNTG Holdings, Inc., FNTS Holdings, Inc., Fidelity National Title Group, Inc., Fidelity National Title Insurance Company, Alamo Title Insurance, Chicago Title and Trust Company, Commonwealth Land Title Insurance Company, Commonwealth Lawyers Title Agency Holding, LLC, Lawyers Title Company, LLC, Security Title Guaranty Co., Ticor Title Company, Service Link, Inc. Chicago Title Insurance Co., Power Link General Partner, LLC, Power Link Settlement Services, LP, and Vision Global Solutions, LLC.

June 18, 2013 (doc. #62), and the Fidelity Defendants filed a Motion to Stay discovery pending resolution of their Motion to Dismiss (doc. #64).

The parties filed a Proposed Scheduling Order on June 18, 2013 (doc. #67). This court held a Scheduling Conference on June 25, 2013, at which the undersigned set a second Scheduling Conference for July 31, 2013 with instruction that the parties hold another Rule 26(f) Conference to address conducting discovery in phases and a protocol for e-discovery (doc. #69). On July 5, 2013, Plaintiff filed a notice of voluntary dismissal as to Defendants Alamo Title Insurance, Castle Stawiarski, LLC, Chicago Title and Trust Co., Colorado American Title, LLC, Commonwealth Land Title Insurance Company, Commonwealth Lawyers Title Agency Holding, LLC, CS Legal Services, Fidelity National Title Group, Inc., First American Financial Corporation, First American Title Insurance Company, FNTG Holdings, Inc., FNTS Holdings, Inc., Lawyers Title Company, LLC, Next Organization, LLC, Power Link General Partner, LLC, Power Link Settlement Services, LP, Security Title Guaranty Co., Single Source Property Solutions, LLC, Ticor Title Company, and Vision Global Solutions, LLC (doc. #70). Judge Blackburn ordered the dismissal of these Defendants on July 8, 2013 (doc. #73). Plaintiff filed a Response to the Fidelity Defendants' Motion to Dismiss on July 5, 2013 (doc. #71), and a response to their Motion to Stay on July 12, 2013 (doc. #76).[3] Plaintiff then filed an amended Motion for Protective Order on July 23, 2013 (doc. #85). Defendants filed their Reply in Support of Motion to Dismiss on July 24, 2013 (doc. #87), pursuant to an order granting their unopposed motion for an extension of time (doc. # 78 and #80). Defendants filed a Proposed Scheduling Order on July 24, 2013 (doc. #89), and filed a Reply in Support of Motion to Stay on July 29, 2013 (doc. #90).

---

[3] Following Judge Blackburn's July 8, 2013 Order of Dismissal, the only Defendants remaining in the lawsuit are Fidelity National Financial, Inc, Fidelity National Title Insurance Company, Chicago Title and Trust Company, Service Link, Inc., and Service Link, LLC, referred to henceforth as "Defendants."

This court held a second Scheduling Conference on July 31, 2013, at which the undersigned denied Plaintiff's Stipulated Motion for Protective Order as moot, granted Plaintiff's amended Motion for Protective Order, and set a Motion Hearing regarding Defendants' Motion to Dismiss for August 15, 2013 (doc. #92). On August 8, 2013, Plaintiff filed a Motion to Vacate Oral Argument and Notice of Intent to File Motion to Amend Complaint (doc. #93). This court granted Plaintiff's Motion to Vacate and ordered Plaintiff to file a Second Amended Complaint ("SAC") by September 13, 2013 (doc. #95). Defendants filed an unopposed Motion for Leave to file supplemental authority regarding their Motion to Dismiss on August 26, 2013 (doc. #99), which this court granted on August 27, 2013 (doc. #101).

At the request of Plaintiff's counsel, this court held a Telephonic Discovery Hearing on September 6, 2013 (doc. #107), at which the undersigned discussed with the parties the need to engage in targeted discovery and Plaintiff's intention to file an amended complaint. Plaintiff thereafter filed an unopposed motion to amend his FAC (doc. #108). The Motion was granted and Plaintiff's SAC was accepted for filing on September 17, 2013 (doc. #109). Defendants filed an unopposed Motion for Extension of time to respond to the SAC (doc. #118), which this court granted on October 7, 2013 (doc. #120). Defendants filed their Motion to Dismiss on October 11, 2013 (doc. #121). Plaintiff filed his Response to the Motion to Dismiss on November 7, 2013 (doc. #126), pursuant to this court's order granting his unopposed Motion for Extension of time (doc. #123 and #125). Defendants filed a Reply in Support of their Motion to Dismiss on November 26, 2013 (doc. #129). On December 9, 2013, this court granted Defendants' Motion to Stay Discovery pending resolution of their Motion to Dismiss (doc. #130). Defendants filed a Motion for Leave to file supplemental authority regarding their Motion to Dismiss on December 23, 2013 (doc. #132), which this court granted on December 26,

2013 (doc. #133).   Plaintiff then filed an unopposed Motion for Leave to file supplemental authority regarding his Response to Defendants' Motion to Dismiss (doc. #134).   This court held a Motion Hearing on Defendants' Motion to Dismiss on January 27, 2014, at which the undersigned granted Plaintiff's Motion for Leave to file supplemental authority, continued the stay of discovery pending a written recommendation regarding the Motion to Dismiss, and indicated his preliminary position regarding Freddie Mac's entity status and Plaintiff's allegations of retaliatory conduct.   (Doc. #136).   Plaintiff filed a second Motion for Leave to file supplemental authority on June 11, 2014 (doc. #139), which Judge Blackburn denied on June 13, 2014 (doc. #140).

## FACTUAL ALLEGATIONS

Plaintiff alleges the following facts in his SAC.   Defendant Fidelity National Financial, Inc. ("Fidelity National Financial") provides title insurance, specialty insurance, and claims management services.   Defendant Fidelity National Title Insurance Company ("Fidelity National Title") is a subsidiary of Fidelity National Title Group, Inc. and provides title insurance, underwriting, escrow, and closing services.   Defendant Chicago Title Insurance Company ("Chicago Title") is also a subsidiary of Fidelity National Title Group, Inc., and provides title examinations, title insurance, and closing services.   Chicago Title operates a division known as Service Link[4], which provides title work and title insurance that is issued in Chicago Title's name.   Service Link contracted with Freddie Mac to provide closing services on properties that Freddie Mac sold to the public.   Fidelity National Financial positioned Service Link as its

---

[4] Plaintiff refers to Defendants Service Link, Inc. and Service Link, LLC as "Service Link," thus this court will as well.   Prior to June 2011, Service Link, LLC was known as Service Link Title Company.   Service Link Title Company, LLC now owns Service Link, LLC.

"national lender platform."[5]   (Doc. #109 at ¶ 39).   Defendants are related entities with common

employees, offices, and business names.  *Id.* at ¶ 20.

As early as 2006, Service Link and First American Title Insurance successfully bid to

provide real estate and title services to Freddie Mac for almost all of Freddie Mac's real estate

owned properties.[6]  Defendants thereafter contracted with Freddie Mac to provide title services,

including title searches "that comply with title industry standards and with applicable law" in

connection with properties sold by Freddie Mac to the public.  (Doc. #109 at ¶ 42).   Title

companies perform title searches prior to issuing a title commitment, which represents the

company's agreement to insure the property and reflects all the defects on a title that have been

detected during the title search.  *Id.* at ¶ 47.  A title insurance policy, or "owner's policy," is

issued subsequent to a title commitment.   Certain defects in title, such as outstanding tax

liability, are referred to as "requirements," because the title company will not issue a policy until

the defect is cured.  Other defects are known as "exceptions," indicating that the policy will be

issued but coverage will not extend to those defects.  The title insurance policy reimburses the

buyer of property for any damages arising out of defects in title that are not expressly excepted.

Plaintiff has worked for Defendant Fidelity National Title since 2005.  He began working

with Service Link in 2007 when a Freddie Mac representative approached him at an industry

conference to assist in resolving "some of Freddie Mac's concerns" regarding Service Link's

closing services.  (Doc. #109 at ¶ 76).  In fall of 2007, Plaintiff and his supervisor at the time,

Darren Hone, attended a meeting at Service Link headquarters to discuss the property closing

process in states that Freddie Mac considered "trouble states," which included Colorado.  During

---

[5] Plaintiff states that it is unclear which Service Link entity is considered the national lender platform for Fidelity National Financial.

[6] Freddie Mac acquires residential "real estate owned" properties when a mortgage "becom[es] delinquent" and "subject to foreclosure."  (Doc. #110-3 at p. 1).  Freddie Mac then resells those properties to the public.  (Doc. #109 at ¶ 2).

a tour of the headquarters following the meeting, the Chief Title Officer for Service Link represented to Plaintiff that their title searches typically listed "garbage exceptions" on title searches without elaboration or further investigation.  *Id.* at ¶ 80.  A garbage exception is known in the industry as an overly broad exception that does not refer to a specific recorded document.  Soon after Plaintiff began supervising escrow services that Service Link was providing to Freddie Mac, his office began receiving phone calls from real estate agents who represented buyers in Service Link transactions; these agents inquired about covenants, conditions, and restrictions ("CCRs") they knew existed in certain subdivisions but that were missing from Service Link's title searches.   After some investigation, Plaintiff discovered that Service Link never included CCRs in its title commitments.  *Id.* at ¶ 83.  This prompted Plaintiff to review closed Service Link files for missing exceptions and compare Service Link title commitments to commitments he generated using Fidelity National Title's access to a property records databank known as SKLD.[7]   Plaintiff discovered that the majority of Service Link's title commitments omitted property-specific exceptions.

In January 2008, Plaintiff prepared a report detailing what he perceived to be Service Link's failure to follow Colorado statutes and regulations in performing closing services for Freddie Mac's properties and submitted the report to Hone.  Hone instructed Plaintiff to send the report to Don Dubois, an executive with Fidelity National Financial.   (Doc. #109 at ¶ 87).  Dubois never responded.

In March 2008, Plaintiff instructed Service Link to begin including CCRs in title commitments, which cost $4.00 more per commitment. After several months, Service Link's managers advised Plaintiff that the extensive search was too costly based on the "National

---

[7] SKLD is accessible by members only and contains 38.5 million land records and over 26 million document images for properties located in Colorado's fourteen largest counties.  Service Link does not have access to SKLD even though it is the only comprehensive database of Denver area properties. *Id.* at ¶ 59.

Platform" that Service Link had built.  Thereafter, Plaintiff compiled several sets of comparisons using Fidelity Title Insurance commitments he had prepared and Service Link commitments for the same properties, attached the comparisons to his report, and forwarded a copy to Paul Perez, another Fidelity National Financial executive.  (Doc. #109 at ¶ 90).  Plaintiff received no response from Perez.  In the three years that followed, Fidelity National Title executives demoted Plaintiff twice, reduced his monthly commission, revoked his car allowance, removed him from the Service Link account, restricted his access to SKLD, and decreased his monthly salary twice before ultimately eliminating his salary altogether.  Plaintiff is currently employed with Fidelity National Title as a sales representative.

## STANDARD

**A.     Rule 12(b)(6)**

Under Rule 12(b)(6) a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  As the United States Tenth Circuit Court of Appeals explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), "the mere metaphysical

possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."   "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."   *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic Corp.*, 550 U.S. at 556).   The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."   *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

**B.      Federal Claims Act**

Generally, the FCA protects against "fraudulent attempts to cause the Government to pay out sums of money."   *U.S. v. Niefert-White Co.*, 390 U.S. 228, 233 (1968).   Under the FCA, private parties can bring *qui tam* actions in the name of the United States to enforce the provisions of the statute.   31 U.S.C. § 3730(b).   Prior to 2009, the FCA imposed liability on one who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government…a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2006), and who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(2) (2006).   The term "claim" was defined by the FCA as a request or demand for money that is "presented to an officer, employee, or agent of the United States," or "is made to a contractor, grantee, or other recipient" if "[t]he United States Government provides any portion of" or "will reimburse such contractor, grantee, or other recipient for any portion of" the request or demand.   31 U.S.C. § 3729(c) (2006); *see U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 493 (D.C. Cir. 2004)

("False Claims Act liability will attach if the Government *provides* the funds to the grantee *upon presentment of a claim* to the Government.  Liability will also attach if, after the grantee presents the claim, the Government *provides* the funds directly to the claimant…").

On May 20, 2009, Congress passed the Fraud Enforcement Recovery/Remedies Act ("FERA").  Under FERA, the FCA imposes liability on one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," and who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(1)(A)-(B).  FERA contains a retroactivity provision that applies only to section 3729(a)(1)(B) for all claims pending on or after June 7, 2008.  *See* Pub.L. No. 111–21, § 4(f)(1); *U.S. ex rel. Wilkins v. United Health Group*, 659 F.3d 295, 303 (3d Cir. 2011).  Under the 2009 amendments, "claim" is defined as "any request or demand" that is "presented to an officer, employee, or agent of the United States," or "is made to a contractor, grantee, or other recipient if the money is spent or used on the Government's behalf or to advance a Government program or interest," and if the government "provides or has provided any portion of the money requests," or "will reimburse such contractor, grantee, or other recipient" for "any portion of the money" that is requested or demanded."  31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

Even after FERA, liability under the FCA requires (1) a claim, (2) that the claim or a statement material to a claim was false or fraudulent, and (3) the defendant knew the claim or statement was false or fraudulent.  *See United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010).

The FCA also imposes liability for a reverse false claim, which occurs when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an

obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  Finally, the FCA protects against employer retaliation by providing for damages and reinstatement if the employee suffered demotion or termination as a result of the lawsuit.  31 U.S.C. § 3730(h)(1)-(2).

## ANALYSIS

Plaintiff alleges that Defendants have continuously violated the FCA since 2006 by charging Freddie Mac for title commitments that rely on deficient title searches.  Plaintiff claims the FCA applies because Freddie Mac is a government actor or agent; and Defendants' requests for payment constitute false or fraudulent claims, and/or Defendants' receipt of payment from Freddie Mac constitutes reverse fraud.  Plaintiff also posits that if Freddie Mac was not a government actor in 2006, it became one in 2008 when it was placed into a conservatorship.  Finally, Plaintiff asserts that if Freddie Mac was not a government actor during the time in question, Defendants are liable under the 2009 FERA amendments as a contractor, grantee, or other recipient.  Plaintiff also claims that Defendants Fidelity National Title and Fidelity National Financial are liable for retaliatory conduct in violation of 31 U.S.C. § 3730(h).

**A.    Freddie Mac Was Not a Government Entity Prior to the 2008 Conservatorship**

Freddie Mac was created by Congress in 1970 as an alternative to the Federal National Mortgage Association ("Fannie Mae").  Freddie Mac was intended to help stabilize the market for residential mortgages by making the secondary mortgage market more competitive.  *See* 12 U.S.C. § 1451.  Freddie Mac functions as a secondary purchaser of residential mortgages, thereby increasing liquidity for the primary mortgage lenders.

In response to the crisis in the housing and mortgage market, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), creating the Federal Housing Finance Agency ("FHFA"). *See* Pub. L. No. 110–289, § 1101 (codified at 12 U.S.C. § 4511). HERA granted the director of the FHFA conditional authority to place regulated entities, including Fannie Mae and Freddie Mac, into conservatorship and/or receivership "for the purpose of reorganizing, rehabilitating, or winding up [their] affairs." *See Judicial Watch, Inc. v. Federal Housing Finance Agency*, 744 F. Supp. 2d 228, 230 (D.D.C. 2010) (quoting 12 U.S.C. § 4617(a); Pub. L. No. 110–289, § 4616). The FHFA placed Freddie Mac into conservatorship on September 6, 2008.

Courts are in uniform agreement that prior to the FHFA conservatorship neither Freddie Mac nor its sister entity Fannie Mae were government actors.[8] *See, e.g., American Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F.3d 1401, 1406 (9th Cir. 1996) (holding that pre-conservatorship Freddie Mac was not a government actor because it was not controlled by the government); *accord Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 91 (D.D.C. 2012). The Supreme Court's analysis in *Lebron v. National Railroad Passenger Corp.* helped form the basis of this conclusion. *See Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 398 (1995). In *Lebron*, the Court determined that the National Railroad Passenger Corp. (Amtrak) was a government actor because it was "created by special statute, explicitly for the furtherance of federal governmental goals…[and] six of the corporation's eight externally named directors…are appointed directly by the President of the United States." *Id.* at 397. Freddie Mac is likewise a corporation chartered by Congress and given federal governmental objectives such as "to maintain the secondary mortgage market and assist in meeting low- and moderate-income

---

[8] For purposes of the issues before this court, Fannie Mae and Freddie Mac are substantially identical in all material respects. *See May v. Wells Fargo Bank, N.A.*, 2013 WL 3207511, at *4 (S.D. Tex. June 24, 2013) (citing *In re Kapla,* 485 B.R. 136, 147 (Bankr.E.D.Mich. 2012).

housing goals." *American Bankers Mortg. Corp.*, 75 F.3d at 1407 (internal citation omitted). However, the government does not "control[] the operation of [Freddie Mac] through its appointees." *Id.* (noting that 13 of 18 members on Freddie Mac's board of directors are elected annually by the voting common shareholders, and Freddie Mac shares are publicly traded on the New York Stock Exchange) (quoting *Lebron*, 513 U.S. at 398).

Plaintiff cites a handful of cases where Freddie Mac was treated as a government instrumentality prior to 2008 for the purpose of the *Merrill* Doctrine and pursuant to express statutory language. (Doc. #126 at p. 9 n.19) (citing *Rust v. Johnson*, 597 F.2d 174, 178 (9th Cir. 1979); *Paslowksi v. Standard Mortg. Corp. of Ga.*, 129 F. Supp. 2d 793, 801-03 (W.D. Pa. 2000); *Mendrala v. Crown Mortgage Co.*, 955 F.2d 1132, 1139-40 (7th Cir. 1992); *Kidder Peabody & Co., Inc. v. Unigestion Intern., Ltd.*, 903 F. Supp. 479, 495-96 (S.D.N.Y. 1995); *Federal National Mortgage Association v. Lefkowitz*, 390 F. Supp. 1364, 1368 (S.D.N.Y. 1975)). None of these cases consider the status of Freddie Mac in the FCA context, however. Plaintiff also argues that *Rainwater v. U.S.*, 356 U.S. 590, 592 (1958) and *Wood ex rel. U.S. v. American Institute in Taiwan*, 286 F.3d 526, 531(D.C. Cir. 2002) offer better guidance for determining whether Freddie Mac constitutes a government entity in the FCA context. However, the entity in *Rainwater* was statutorily deemed an "agency and instrumentality of the United States," and the entity in *Wood* was considered an agency or instrumentality of the federal government because of its close resemblance to an embassy. The test articulated in *Lebron* and its progeny are more persuasive in this context.

Plaintiff argues that Freddie Mac is also an agent of the government. (Doc. #126 at p. 7) (citing *Lyttle v. AT&T Corp.*, No. 2:10-1376, 2012 WL 6738242 (W.D. Pa. Nov. 15, 2012). Plaintiff claims an agency relationship exists because Freddie Mac was chartered to serve the

14

public interest, it "acts according to federal law in carrying out its public mission, including buying and guaranteeing mortgages and [mortgage backed securities]," and it is "subject to the Government's control in buying and guaranteeing mortgages." *Id.* at pp. 7-8. The magistrate judge in *Lyttle* was tasked with determining whether the private administrator of a federally-mandated Federal Communications Commission's ("FCC") fund was an agent of the government. The term "agent" is not specifically defined in the FCA. In deciding that the administrator acted on the government's behalf and was subject to the government's control, the court found that the FCC's regulations, orders, and contracts dictate what the administrator "shall do" and "shall not do," establish that the FCC retains the right to give interim instructions, and provide that the FCC retains the right to replace the administrator if necessary. *Id.* at *16, *18. As Defendants point out, Plaintiff has not alleged that the government exercises the degree or specificity of control over Freddie Mac that was present in *Lyttle*, nor are Freddie Mac's duties as narrow and limited as those of the fund's administrator. Moreover, government control over Freddie Mac was limited pre-conservatorship for the reasons addressed above; and, as explained below, the FHFA conservatorship did not alter that degree of control. Accordingly, Freddie Mac was not a government entity or an agent of the government prior to 2008. The portion of Plaintiff's First, Second, and Third claims that pre-date September 6, 2008 should be dismissed.

## B.     Freddie Mac Was Not a Government Entity Following the 2008 Conservatorship

Plaintiff claims that even if Freddie Mac was not a government actor prior to 2008, it became one pursuant to the FHFA conservatorship because the FHFA assumed the powers of Freddie Mac's officers, took title to its assets, capital, and property, suspended shareholder voting rights, and delisted Freddie Mac's shares from the New York Stock Exchange. (Doc. #109 at ¶ 34). Moreover, Plaintiff argues, the FHFA estimated in 2010 that the bailout of

Freddie Mac and Fannie Mae would cost between $246 and 360 million, and opined with the Congressional Budget Office, the Commodities Futures Trading Commission, and others that the financial relationship between itself, the U.S. Treasury, and the Federal Reserve amounted to an explicit guarantee of Fannie Mae and Freddie Mac mortgages and securities.  *Id.* at ¶ 37.

The Tenth Circuit has not addressed whether the conservatorship established by HERA brought Freddie Mac within the ambit of the FCA.  However, several other courts have considered the composition of post-conservatorship Freddie Mac and Fannie Mae for the separate but related question of whether constitutional claims could be asserted against them, and found that the entities are not government actors.  *See, e.g., Herron*, 857 F. Supp. 2d at 92; *Lopez v. Bank of America, N.A.*, 920 F. Supp. 2d 798, 801 (W.D. Mich. 2013); *May v. Wells Fargo Bank, N.A.*, 2013 WL 3207511, at *5-6 (S.D. Tex. June 24, 2013).

In *Herron*, District Judge Collyer granted Fannie Mae's motion to dismiss a *Bivens* claim for violation of the First Amendment on the basis that the FHFA conservatorship did not change Fannie Mae's non-government status.  The court recounted a thorough history of Fannie Mae's private entity characteristics, such as a privately controlled Board of Directors, securities that were not guaranteed by the federal government, and autonomy in hiring and compensating its employees (all of which are characteristics that Freddie Mac shares),[9] and relied on the law of conservatorship and receivership in finding that Fannie Mae retained its private status after September 6, 2008.  FHFA as conservator took over Fannie Mae and Freddie Mac's assets and operations for the purpose of conducting business in order to preserve and conserve assets and property.  12 U.S.C. § 4617(b)(2)(A) & (B).  Pursuant to this scope of power, FHFA "step[ped] into the shoes" of Fannie Mae and Freddie Mac.  *Herron*, 857 F. Supp. 2d at 94 (analogizing the FHFA conservatorship to FDIC conservatorships and receiverships as discussed in *O'Melveny &*

---

[9] *See American Bankers Mortgage Corp.*, 75 F.3d at 1405.

*Myers v. FDIC*, 512 U.S. 79, 86-87 (1994)).  FHFA's status as a federal agency changed for the purpose of the conservatorship; Fannie Mae and Freddie Mac's status as private entities did not. *Id.* (citing *United States v. Beszborn*, 21 F.3d 62, 67-68 (5th Cir. 1994).  The FHFA conservatorship would cause Fannie Mae (and Freddie Mac) to become a federal actor if it retained for the government permanent control, i.e. authority to appoint a majority of the corporation's directors.  *Id.* (citing *Lebron*, 513 U.S. at 400).  However, the FHFA was appointed as conservator in a temporary capacity.  12 U.S.C. § 4617.  "[T]here is no provision in the statute that retains for the federal government any permanent control over Fannie Mae."  *In re Kapla*, 485 B.R. 136, 152 (E.D. Mich. 2012).[10]

I am hard pressed to find that the reasoning in *Herron* is not equally sound and applicable in the context of an FCA claim.  Because Freddie Mac is not a government actor, Plaintiff's First and Second claims should be dismissed to the extent he alleges that Defendants violated 31 U.S.C. § 3729(a)(1) & (2) and/or 31 U.S.C. § 3729(a)(1)(A) & (B) by presenting a claim for payment to, or causing a claim to be paid by, an officer, employee, or agent of the United States.  Plaintiff's Third claim for violation of 31 U.S.C. § 3729(a)(7) and/or 31 U.S.C. § 3729(a)(1)(G) should likewise be dismissed.[11]

## C.    Defendants' Liability Under the Fraud Enforcement Recovery/Remedies Act

Plaintiff also claims that Freddie Mac is a government grantee or similar recipient of government funds because (1) the U.S. Treasury purchased in excess of $100 billion worth of

---

[10] Indeed, shortly after Freddie Mac was placed into conservatorship, James Lockhart, the Director of FHFA at the time, issued the following statement, "FHFA has placed Fannie Mae and Freddie Mac into conservatorship.  That is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations.  FHFA will act as the conservator to operate the Enterprises until they are stabilized."  *See Herron*, 857 F.Supp.2d at 91 (quoting Statement of FHFA Director (Sept. 7, 2008)).

[11] Furthermore, Plaintiff has not stated a claim for reverse false claims because Plaintiff has not alleged that Defendants owed an obligation to pay money to the United States.  *See U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012).  "A reverse false claim is documentation resulting in an underpayment to the Government, as opposed to a false claim, generally referring to an inflated or false bill for payment from the Government."  *U.S. ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1040 n. 2 (10th Cir. 2004).

Freddie Mac's senior preferred stock at the request of FHFA; (2) the U.S. Treasury established a short-term loan credit facility for Freddie Mac and Fannie Mae secured by the entities' mortgage-backed securities; and (3) the Federal Reserve purchased over $175 billion of Freddie Mac and Fannie Mae's agency debt and over $1.25 trillion of their guaranteed mortgage-backed securities.  (Doc. #109 at ¶ 36).  Plaintiff further claims that the monies spent by Freddie Mac pursuant to its contract with Defendants "are spent on the Government's behalf to advance the Government interest in stabilizing the secondary mortgage market in order to increase home ownership." *Id.* at ¶ 126.  Defendants argue that even if Freddie Mac is considered a government grantee or similar recipient of government funds, the remainder of Plaintiff's First and Second claims must be dismissed due to the lack of a nexus between the federal bailout money and Freddie Mac's payments to Defendants.

The only court to consider whether the FCA applies to Freddie Mac and Fannie Mae following FERA opined without analysis that the amendment "arguably extends the FCA to false claims made to [those entities]," but ultimately dismissed the FCA claims for plaintiff's failure to meet the particularity requirements of Rule 9(b).  *U.S. v. Countrywide Financial Corp.*, 961 F. Supp. 2d 598, 608 (S.D.N.Y. 2013).  Assuming *arguendo* that FERA applies here, Plaintiff has not alleged the requisite nexus between Freddie Mac's payments to Defendants and an economic loss or possibility of an economic loss suffered by the federal government.

Courts that have analyzed more generally the contractor provision in 31 U.S.C. § 3729(b)(2)(A)(ii) have found that the amendment requires a connection between government funds and the funds used to pay a false claim.  *See Garg v. Covanta Holding Corp.*, 478 Fed. Appx. 736 (3d Cir. 2012); *Lyttle*, 2012 WL 6738242, at *19-21.  The *Garg* court explained that the FCA requires "some greater nexus between the alleged fraud and the government funds [than

mere allegations that the defendant received a direct financial subsidy from the federal government]."  478 Fed. Appx. at 741.  "The FCA does not apply to fraud against *any* federal grantee; it requires that *the specific money or property claimed must be intended to 'be spent or used on the Government's behalf or to advance a Government program or interest*.'"  *Id.* (quoting 31 U.S.C. § 3729(b)(2)(A)(ii)).  Furthermore, the plain language of the amendment requires that the federal government provide at least a portion of the specific "money or property requested," or reimburse the grantee for that specific demand.  31 U.S.C. § 3729(b)(2)(A)(ii)(I)-(II).  The court in *Lyttle* emphasized that in order to rely on § 3729(b)(2)(A)(ii), "the money [for the claim] must actually be provided by the government such that the false claim causes financial loss to the government."  2012 WL 6738242, at *20.

Plaintiff argues that the above requirements are satisfied because Freddie Mac "received billions in funds, in the form of federal subsidies, a Treasury line of credit, and a bailout, all to advance its public mission related to the mortgage/housing markets."  (Doc. #126 at p. 3).  Furthermore, Plaintiff claims, FHFA had "complete control" as of September 6, 2008, and "the Treasury was granted the authority to provide Freddie 'unlimited capital (by purchasing [its] stock) in order to maintain solvency through 2012.'"  *Id.* at p. 4.

This argument would be more persuasive if Plaintiff had alleged that Freddie Mac operates exclusively with federal funds.[12]  But such is not the case.  The fact that Freddie Mac must rely on injections of federal capital to continue advancing the governmental objective with which it was tasked, i.e. stabilizing the secondary market for residential mortgages, does not

---

[12] Plaintiff alleges that "when FERA became effective, Freddie had only federal dollars, as it was insolvent."  (Doc. #126 at p. 4).  This is the only time Plaintiff suggests that Freddie Mac relies wholly on government money in order to operate; however, Freddie Mac's insolvency is not synonymous with the notion that only federal funds filled Freddie Mac's coffers.  Insolvency occurs when liabilities exceed assets, or when a debtor "cannot pay his debts as they fall due."  *Black's Law Dictionary* 716 (5th ed. 1979).  By definition, an entity may become insolvent while retaining possession of its assets.

change the equally relevant fact that Freddie Mac still generates revenue pursuant to its operation within the secondary mortgage market. (*See* Doc. #109 at ¶¶ 104-107) (referencing proceeds Freddie Mac received from property sales). Plaintiff alleges only that Freddie Mac has received a sizable amount of government funding; he has not alleged that government money is the sole source of funds available to Freddie Mac, nor has he specified how Freddie Mac allocated its revenue such that Defendants' invoices were paid with at least a portion of government money. "[O]nly actions which have the purpose and effect of causing the government to pay out money are clearly claims' within the purpose of the Act." *Garg*, 478 Fed. Appx. at 741 (quoting *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 179 (3d Cir. 2001)). Plaintiff has not identified the necessary link between the money Freddie Mac received from the government and the money Freddie Mac used to pay Defendants for title policies; accordingly, the portions of Plaintiff's First and Second claims predicated on 31 U.S.C. § 3729(b)(2)(A) should be dismissed.

**C.      The Requirement of a False or Fraudulent Claim Under the Federal Claims Act**

In light of the arguably unsettled questions regarding Freddie Mac's status following the FHFA conservatorship and the reach of FERA, I will address Plaintiff's allegations that the title searches constitute false or fraudulent claims. A prerequisite for FCA liability is a claim, or statement material to a claim, that was false or fraudulent, and knowledge on behalf of the defendant that the claim or statement was false or fraudulent. 31 U.S.C. § 3729(a)(1)(A); *see Pervez*, 736 F. Supp. 2d at 811. Plaintiff has not alleged falsity or fraud.

Plaintiff claims that Defendants contracted with Freddie Mac to provide "full and reasonable" title searches to support title commitments, routinely performed searches of lesser quality, and yet charged Freddie Mac for title insurance policies according to the contracted price as if Defendants had properly performed the search. Plaintiff alleges:

20

> Under its contracts with Freddie Mac [and] according to title industry standards,
> state laws, and state regulations, the title searches undertaken in connection with
> the purchase of residential property and supporting the issuance of an owner's
> title insurance policy must be full and reasonable, *that is, reasonably calculated to
> identify all liens, encumbrances, defects and other matters affecting title to the
> property*." (Doc. #109 at pp. 25-26) (emphasis added).

In other words, Plaintiff claims that Defendants' failure to conduct a search that would identify all liens, encumbrances, defects and other matters affecting title to the property resulted in sub-standard policies. Defendants' requests or demands for payment for these policies thus constituted false or fraudulent claims.

Defendants first contracted with Freddie Mac between 2006 and December 31, 2011 to provide title policies. The parties' contract required that, in producing title commitments prior to issuing title policies and in performing other closing services, "[Service Link] shall comply with all laws, regulations, ordinances, or orders applicable to the Services and the performance of this Agreement, including but not limited to all state and federal requirements for closings, appraisals, valuations, brokerage, fair housing, consumer protection and debt collection." (Doc. #110-3 at § 13(a); doc. #110-4 at pp. 2-7). There is no language in this contract that required Service Link to identify all liens, encumbrances, defects, and other matters that might mar title. Defendants subsequently contracted with Freddie Mac on January 1, 2012 to provide title policies. That contract similarly required compliance with "all applicable legal requirements," without reference to a reasonable search or what that would entail. (Doc. #110-5 at § 5(a)(ii) and pp. 11-15).[13] Plaintiff argues that Defendants billed Freddie Mac for "what they claimed were

---

[13] To the extent Plaintiff claims Chicago Title or Service Link were bound by a servicing contract (doc. #109 at ¶¶61-63), Plaintiff does not allege that Defendants serviced loans for Freddie Mac. Freddie Mac purchases loans from originating lenders then contracts with loan servicers who collect borrowers' monthly mortgage payments and take appropriate actions to preserve the property securing the loans. These loan servicers "collect the borrowers payments, maintain all the necessary accounts (including escrow accounts for taxes and insurance) and mak[e] the necessary disbursements (including remittance of principal and interest to the [note holder] and disbursements for taxes and insurance)." *Deerman v. Federal Home Loan Mortgage Corp.*, 955 F. Supp. 1393, 1396 (N.D. Ala. 1997),

full, reasonable real estate title searches," (doc. #109 at ¶122), but there is no support in either contract that Defendants obligated themselves to perform a search that adhered to such specific criteria.

Plaintiff also claims that Colorado law requires title searches designed to detect all impairments of record. (Doc. #109 at p. 39). However, the relevant statutory law requires only that the title insurance company conduct "a reasonable examination of the title" and determine the "insurability of title in accordance with sound underwriting practices for title insurance companies" prior to writing a policy or contract of title insurance. Colo. Rev. Stat. § 10-11-106(1). The statute provides no definition of a "reasonable" examination, or otherwise suggest that all title defects be identified. The corresponding regulation similarly instructs that an insurer must not issue a commitment for title insurance without first conducting "a reasonable search and examination of the property records for the property to be insured," and a search is reasonable "if it conforms to written standards and practices as determined by the title insurance company that is insuring the transaction." 3 Colo. Code Regs. § 702-3:3-5-1 § 7(A).[14] Neither the contracts nor the applicable law support Plaintiff's contention that Defendants were required to conduct a search that would identify all liens, encumbrances, defects and other matters affecting title to the property, or even define the degree of diligence Defendants were expected to exercise in preparing title commitments.[15] "At a minimum the FCA requires proof of an

---

*aff'd*, 140 F.3d 1043 (11th Cir.1998). A servicing agreement does not apply to Defendants if they were not servicing the loans.

[14] Section 7(B) states that "every title entity shall ensure that the title commitment…fully discloses to all recipients of any title insurance commitment the impairments of record concerning the property to be insured…" Contrary to Plaintiff's interpretation, this court reads this regulation as requiring that an impairment, once discovered, must be clearly and fully disclosed on the commitment, rather than requiring the insurer to identify all defects in a title.

[15] Plaintiff also claims that Defendants failed to follow industry standards for title searches as well as their own policies and procedures. Specifically, Plaintiff references a 2012 newsletter issued by the Center for Insurance Policy and Research, copies of Service Link's abstractor engagement packages, and Fidelity National Title's Underwriting Deskbook. These exhibits essentially demonstrate there are varying standards when conducting a title search. The Center for Insurance Policy and Research instructs that the purpose of a title search is to identify all

objectively verifiable fact." *See U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 Fed. Appx. 980, 983-84 (10th Cir. 2005). Plaintiff fails to allege that Defendants produced substandard title searches because he has not demonstrated an objectively verifiable standard.

Furthermore, title insurers do not perform the same function as an abstractor. Colorado Practice Standards for Real Estate Transactions warns against confusing title commitments with abstracts:

> The attorney should understand that title insurance commitments are not abstracts of title. Rather, title insurance commitments are agreements to insure title as shown and to indemnify the named insured against covered title risks. As such, and given the risk nature of insurance, the practitioner should know that a title insurance commitment and the information reflected therein should not be used as an abstract of title. When a recorded instrument not shown in the commitment and subsequent policy is asserted against the title, the obligations of the company are to respond in accordance with the terms of the contract of insurance, *i.e.*, to defend and/or to indemnify. Actions based upon negligence typically do not lie against the insurer; the remedy is instead governed by the terms of the contract of insurance. 2 Colo. Prac., Methods of Practice § 62:5 (6th ed.)

Plaintiff claims the title work performed by Defendants was "so insufficient as to be worthless to Freddie Mac." (Doc. #109 at ¶ 125). However, Defendants contracted to provide title insurance policies, and there is no disagreement that Defendants provided those policies. Title insurance policy "reimburses the buyer for any damages arising out of defects of title not expressly excepted," and therefore protects the buyer in the event liens, encumbrances, or ownership disputes exist. *Id.* at ¶ 51. The title policies were not worthless because regardless of undisclosed defects, they provided coverage for the property owner. In fact, Defendants bore the risk of any defects their title searches failed to detect. Accordingly, Defendants did not present a

---

prior owners and any liens, encumbrances, or similar defects so as to make the buyer aware of the state of property prior to purchase. (Doc. #126 at p. 13). Fidelity National Title discourages the use of general exceptions and instructs that a "standard" search should constitute a forty-year review of the property. (Doc. #109 at ¶ 70). Service Link's engagement package in effect between 2009 and 2012 lists the names and descriptions of various searches that abstractors can perform; and following a May, 2012 revision, Service Link defines a "full search" as a forty-year review of the property's history. (Doc. #109-1 and #109-2). Plaintiff's argument and supporting exhibits do not alter the wording of the parties' contracts, however, which did not specify the type of title search Defendants would perform.

false or fraudulent claim when they sought payment for the title policies they issued, nor, per the terms of the contract, did they omit material facts.

Because this court finds that Freddie Mac is not a government actor or agent, and Plaintiff has not alleged a nexus between the grant of federal funds to Freddie Mac and Freddie Mac's payments to Defendants, or that Defendants presented a false or fraudulent claim for payment, I need not consider whether the Filed Rate Doctrine or Rule 9(b) bars Plaintiff's claims.

**D.      Plaintiff's Claim for Retaliatory Treatment Under the Fair Claims Act**

Plaintiff alleges that Fidelity National Title and Fidelity National Financial engaged in retaliatory treatment after he voiced his concerns that Service Link's failure to perform full and reasonable title searches constituted fraud.  Defendants argue that Plaintiff's retaliation claim should be dismissed as to both entities because he has not stated a viable claim under the FCA and he fails to allege that Defendants knew he was taking action in furtherance of a private *qui tam* suit or assisting in a government-sponsored FCA investigation; and the retaliation claim should be dismissed as to Fidelity National Financial because that entity was not Plaintiff's employer.

The purpose of the Federal Claims Act is to discourage fraud against the government and to incentivize persons with knowledge of fraud to come forward.  The "whistleblower" provision of the FCA prevents the harassment, retaliation, or threatening of employees who assist in or bring *qui tam* actions. In particular, the statute provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that [person] whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under

24

this section or other efforts to stop one or more violations of this subchapter. 31 U.S.C. § 3730(h) (2010).

The activity prompting retaliation "must have been taken in furtherance of an FCA enforcement action," *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996), and a whistleblower "must show the employer had knowledge the employee engaged in 'protected activity.'" *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, (5th Cir. 1994) (quoting S.Rep. No. 345, 99th Cong., 2d Sess. 35 (1986), *reprinted in,* 1986 U.S.C.C.A.N. 5266, 5300). However, it is not necessary that the plaintiff know that the investigation he or she is pursuing could lead to a False Claims Act suit, *U.S. ex rel. Yesudian v. Howard University*, 153 F.3d 731, 741 (D.C.C. 1998), nor is there a requirement that a party succeed on his or her FCA claim or even file a lawsuit. *Ramseyer*, 90 F.3d at 1522; *see also Neal v. Honeywell, Inc.*, 826 F. Supp. 266, 270-71 (N.D. Ill. 1993) ("federal whistleblower protection laws are to be broadly construed to cover internal whistleblowers, even where the specific conduct at issue does not fall within a literal reading of the statute."). The necessary notice to an employer to support a claim for retaliatory treatment may be provided by informing the employer of illegal activities that would constitute fraud on the United States. *McBride v. Peak Wellness Center, Inc.*, 688 F.3d 698, 704 (10th Cir. 2012).

The FCA does not define "employer." Courts have embraced a liberal interpretation of what constitutes an employment relationship, at times drawing from the body of Title VII litigation for guidance. *See, e.g., U.S. ex rel. Kent v. Aiello*, 836 F. Supp. 720, 726 (E.D. Cal. 1993). The Tenth Circuit has relied on the integrated enterprise test to determine whether a parent corporation is liable for the acts of its subsidiaries in a Title VII action. *Frank v. U.S. West Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993). This test requires consideration of four factors: "(1) integration of operations, (2) centralized control of labor relations, (3) common

management, and (4) common ownership or financial control." Whether the parent controls labor relations is "'an important factor' in the four-part integrated enterprise test." *Id.* at 1363; *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983) ("[t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?") (internal citations omitted).

As Fidelity Title Insurance's Manager of Residential Sales and Escrow of the Denver office, Plaintiff earned over $200,000 in salary and commissions in 2008, the year he began reporting fraud to his supervisors. Plaintiff prepared his report on fraud in January 2008 and presented it to his immediate supervisor at Fidelity Title Insurance, Mr. Hone. Hone instructed Plaintiff to send the report to the Executive Vice President of Fidelity National Financial, Mr. Dubois. Dubois never responded to Plaintiff regarding the report, though he contacted Hone for an opinion regarding Plaintiff's analysis. Hone told Dubois he thought that Plaintiff's concerns had merit. (Doc. #109 at ¶ 88). After Dubois failed to respond, Plaintiff mailed his report to Fidelity National Financial's Chief Compliance Officer, Mr. Perez, in April 2008, along with copies of Service Link title searches that Plaintiff had determined omitted defects. One month later, Dubois visited Fidelity Title Insurance's Denver office for the purpose of instating Jan Kailey as the Manager of Residential Sales and Escrow in Fidelity Title Insurance's Denver office, effectively supplanting Plaintiff. During that visit, Dubois, without explanation, instructed Hone to demote Plaintiff from his managerial position, but allowed Plaintiff to retain his title of vice president.

One year passed before Plaintiff contacted Perez a second time regarding his concerns of fraud. Plaintiff warned Perez that failure to respond would result in Plaintiff approaching Fidelity National Financial's Founder and Chairman of the Board of Directors with the report.

Almost immediately, Fidelity National Financial's corporate office called Fidelity Title Insurance's Denver office asking to speak with Plaintiff's supervisor.   Kailey introduced herself as his supervisor and arranged to accompany Plaintiff to a meeting at Fidelity National Financial's headquarters in Jacksonville, Florida on April 2, 2009.   At the meeting, Plaintiff explained he had acted pursuant to company fliers encouraging employees to report fraud, and that he believed "the company was defrauding the government and consumers with substandard title work."   (Doc. #109 at ¶ 93).   Several months later, Plaintiff was excluded from the company's annual awards dinner in Las Vegas, despite the fact that he had been one of few sales representatives who had earned over $1 million in revenue for the company that year.   When Plaintiff inquired about his invitation he was told he had been inadvertently left off the list.   *Id.* at ¶ 94.

In January 2010, Fidelity National Title merged with Security Title.   Security Title executives John Longo and Lambros Gianos became President of Fidelity National Title and Executive Vice President of Fidelity National Title, respectively.   Within months of assuming these positions, Longo and Gianos demoted Plaintiff from vice president to account manager, reduced his monthly salary by $500, reduced his commission by 10%, and revoked his car allowance.   (Doc. #109 at ¶ 95).   Longo and Gianos reduced his monthly salary by an additional $1,000 two months later.   *Id.* at ¶ 139.   Ultimately, Fidelity National Title eliminated Plaintiff's salary altogether and removed him from the Service Link account.   Plaintiff alleges he never received an explanation for the demotions or reductions in pay.

Plaintiff's allegations suffice to show that he engaged in protected activity, Fidelity National Title and Fidelity National Financial knew of the activity, and both Defendants retaliated against Plaintiff as a result of the activity.   Furthermore, while the parties did not fully

brief the *Frank* factors, Plaintiff's allegations support that Fidelity National Financial asserted sufficient control over Fidelity National Title's employment matters as to be considered an employer for the purposes of section 3730(h). The nature of the relationship between Fidelity National Title and Fidelity National Financial should be further explored, if necessary, in a motion for summary judgment.

Similarly, while this court finds that Freddie Mac is not a government actor and Defendants did not submit false or fraudulent claims, I cannot say at this juncture whether those determinations strip Plaintiff's activity of its protected status. *Cf. Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 66 (D.C. Cir. 2008) (holding that because the plaintiff's allegations lacked one of the legal requirements for a claim under the FCA, the plaintiff's investigation and reporting of the defendant's conduct did not constitute "protected activity."). Questions regarding whether Fidelity National Title and Fidelity National Financial believed that Plaintiff was investigating matters that "[were] calculated, or reasonably could lead, to a viable FCA action," *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996), are better addressed in a motion for summary judgment.

## CONCLUSION

For the foregoing reasons, this court RECOMMENDS that Defendants' Motion to Dismiss (doc. #121) be GRANTED as to Plaintiff's First, Second, and Third claims and DENIED as to Plaintiff's Fourth claim.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 19th day of August, 2014.

BY THE COURT:

s/Craig B. Shaffer_____
United States Magistrate Judge